*126 MARTIN, Chief Justice.
When assessing a challenge to the constitutionality of legislation, this Court’s duty is to determine whether the General Assembly has complied with the constitution. If constitutional requirements are met, the wisdom of the legislation is a question for the General Assembly. E.g., In re Hous. Bonds, 307 N.C. 52, 57, 296 S.E.2d 281, 284 (1982). In performing our task, we begin with a presumption that the laws duly enacted by the General Assembly are valid. Baker v. Martin, 330 N.C. 331, 334, 410 S.E.2d 887, 889 (1991). North Carolina courts have the authority and responsibility to declare a law unconstitutional,[1] but only when the violation is plain and clear. State ex rel. Martin v. Preston, 325 N.C. 438, 449, 385 S.E.2d 473, 478 (1989). Stated differently, a law will be declared invalid only if its unconstitutionality is demonstrated beyond reasonable doubt. Baker, 330 N.C. at 334-35, 410 S.E.2d at 889.
In this case plaintiffs challenge the Opportunity Scholarship Program, which allows a small number of students[2] in lower-income families to receive scholarships from the State to attend private school. According to the most recent figures published by the Department of Public Instruction, a large percentage of economically disadvantaged students in North Carolina are not grade level proficient with respect to the subjects tested on the State’s end-of-year assessments.[3] Disagreement exists as to the innovations and reforms necessary to address this and other educational issues in our state. Our state and country benefit from the debate between those with differing viewpoints in this quintessentially political dialogue. Such discussions inform the legislative process. But the role of judges is distinguishable, as we neither participate in this dialogue nor assess the wisdom of legislation. Just as .the legislative and executive branches of government are expected to operate within their constitutionally defined spheres, so must the courts. See In re Alamance Cty. Court Facils., 329 N.C. 84, 94, 405 S.E.2d 125, 130 (1991) (“Just as *127 the inherent power of the judiciary is plenary within its branch, it is curtailed by the constitutional definition of the judicial branch and the other branches of government.”).[4] Our constitutionally assigned role is limited to a determination of whether the legislation is plainly and clearly prohibited by the constitution. Because no prohibition in the constitution or in our precedent forecloses the General Assembly’s enactment of the challenged legislation here, the trial court’s order declaring the legislation unconstitutional is reversed.
* ⅜ ⅜
I
Under the provisions of the Opportunity Scholarship Program,[5] the State Educational Assistance Authority (the Authority) makes applications available each year “to eligible students for the award of scholarship grants to attend any nonpublic school.” N.C.G.S. § 115C-562.2(a) (2014). An “[e]ligible student” is defined as “a student who has not yet received a high school diploma” and who, in addition to meeting other specified criteria, “[r]esides in a household with an income level not in excess of one hundred thirty-three percent (133%) of the amount required for the student to qualify for the federal free or reduced-price lunch program.” Id. § 1150-562.1(3) (2013). A “[n]onpublic school” is any school that meets the requirements of either Part 1 (“Private Church Schools and Schools of Religious Charter”) or Part 2 (“Qualified Nonpublic Schools”) of Article 39 of Chapter 115C of the General Statutes. Id. § 1150-562.1(5) (2013).
The Authority awards scholarships to the program’s applicants, with preference given first to previous scholarship recipients, and then to students in lower-income families and students entering kindergarten or the first grade. Id. § 115C-562.2(a). Subject to certain restrictions, *128 students selected to participate in the program may receive a scholarship grant of up to $4,200 to attend any nonpublic school. Id. § 115C-562.2(b) (2014). Once a student has been selected for the program and has chosen a school to attend, the Authority remits the grant funds to the nonpublic school for endorsement, and the parent or guardian “restrictively endorse [s] the scholarship grant funds awarded to the eligible student to the nonpublic school for deposit into the account of [that] school.” Id. § 115C-562.6 (2013).
A nonpublic school that accepts a scholarship recipient for admission must comply with the requirements of N.C.G.S. § 115C-562.5(a), which include: (1) providing the Authority with documentation of the tuition and fees charged to the student; (2) providing the Authority with a criminal background check conducted on the highest ranking staff member at the school; (3) providing the parent or guardian of the student with an annual progress report, including standardized test scores; (4) administering at least one nationally standardized test or equivalent measure for each student in grades three or higher that measures achievement in the areas of English grammar, reading, spelling, and mathematics; (5) providing the Authority with graduation rates of scholarship program students; and (6) contracting with a certified public accountant to perform a financial review for each school year in which the nonpublic school accepts more than $300,000 in scholarship grants. Id. § 115C-562.5(a)(l)-(6) (2014). Nonpublic schools enrolling more than twenty-five Opportunity Scholarship Program students must report the aggregate standardized test performance of the scholarship students to the Authority. Id. § 115C-562.5(c) (2014). Furthermore, all nonpublic schools that accept scholarship program students are prohibited from charging additional fees based on a student’s status as a scholarship recipient, id. § 115C-562.5(b)- (2014), and from discriminating with respect to the student’s race, color, or national origin, id. § 115C-562.5(cl) (2014); see also 42 U.S.C. § 2000d (2012). Nonpublic schools that fail to comply with these statutory requirements are ineligible to participate in the program. N.C.G.S. § 115C-562.5(d) (2014).
The Opportunity Scholarship Program also subjects the Authority to certain reporting requirements. Each year, the Authority must provide demographic information and program data to the Joint Legislative Education Oversight Committee. Id. § 115C-562.7(b) (2014). The Authority is also required to select an independent research organization to prepare an annual report on “[1] earning gains or losses of students receiving scholarship grants” and on the “[competitive effects on public school performance on standardized tests as a result of the *129 scholarship grant program.” Id. § 115C-562.7(c) (2014). Following submission of these reports to the Joint Legislative Education Oversight Committee and the Department of Public Instruction, “[t]he Joint Legislative Education Oversight Committee shall review [the] reports from the Authority and shall make ongoing recommendations to the General Assembly as needed regarding improving administration and accountability for nonpublic schools accepting students receiving scholarship grants.” Id.
The Opportunity Scholarship Program is funded by appropriations from general revenues to the Board of Governors of the University of North Carolina, which provides administrative support for the Authority. In fiscal year 2014-15, the General Assembly appropriated a total of $10,800,000 to the program.
II
On 11 December 2013, plaintiff Alice Hart and twenty-four other taxpayers filed a complaint in Superior Court, Wake County, challenging the constitutionality of the Opportunity Scholarship Program under the Constitution of North Carolina.[6]
Plaintiffs’ amended complaint asserted five claims for relief, all of which presented facial challenges under the North Carolina Constitution. First, plaintiffs alleged that the Opportunity Scholarship Program “appropriates revenue paid by North Carolina taxpayers to private schools for primary and secondary education” in violation of Article IX, Sections 2(1) and 6, and Article I, Section 15. Second, plaintiffs alleged that the law “appropriates revenue paid by North Carolina taxpayers to private schools for the ostensible purpose of primary and secondary education without those funds being supervised by the Board of Education” in violation of Article IX, Section 5. Third, plaintiffs alleged that the law creates “a non-uniform system of schools for primary and secondary education” in violation of Article IX, Section 2(1). Fourth, plaintiffs alleged that in “transferring] revenue paid by North Carolina taxpayers to private schools without any accountability or requirements ensuring that students will actually receive an education,” the law “does not accomplish any public purpose” in violation of Article V, Sections 2(1) and 2(7). Fifth, plaintiffs alleged that in “transfer[ring] revenue paid by North Carolina taxpayers to private schools that are permitted to *130 discriminate against students and applicants on the basis of race, color, religion, or national origin,”[7] the law serves no public purpose and therefore violates Article V, Section 2(1), and Article I, Section 19. Plaintiffs requested a declaration that the scholarship program is unconstitutional under the challenged provisions, as well as a permanent injunction to prevent implementation and enforcement of the legislation.
On cross-motions for summary judgment, the trial court entered an order and final judgment on 28 August 2014, allowing plaintiffs’ motion for summary judgment on all claims, denying defendants’ and intervenor-defendants’ motions for summary judgment,[8] and declaring the Opportunity Scholarship Program unconstitutional on its face. The trial court permanently enjoined implementation of the Opportunity Scholarship Program legislation, including the disbursement of public funds.
Defendants appealed, and this Court, on its own initiative, certified the appeal for immediate review prior to a determination in the Court of Appeals.[9] For the following reasons, we reverse the trial court’s order and final judgment declaring the Opportunity Scholarship Program unconstitutional and dissolve the injunction preventing further implementation and enforcement of the challenged legislation.
Ill
Defendants’ appeal from the trial court’s order and final judgment presents questions to this Court concerning the construction and interpretation of provisions in the North Carolina Constitution.[10] As the court-of last resort in this state, we answer with finality “issues concerning the proper construction and application of North Carolina laws and the Constitution of North Carolina.” Preston, 325 N.C. at 449, 385 S.E.2d at 479 (citations omitted). Accordingly, our review of the constitutional questions presented is de novo. Piedmont Triad Reg’l Water Auth. v. Sumner Hills Inc., 353 N.C. 343, 348, 543 S.E.2d 844, 848 (2001); see *131 Craig v. New Hanover Cty. Bd. of Educ., 363 N.C. 334, 337, 678 S.E.2d 351, 354 (2009).
In exercising our de novo review, we apply well-settled principles to assess the constitutionality of legislative acts. At the outset, the North Carolina Constitution is not a grant of power, but a limit on the otherwise plenary police power of the State. See, e.g., Preston, 325 N.C. at 448-49, 385 S.E.2d at 478. We therefore presume that a statute is constitutional, and we will not declare it invalid unless its unconstitutionality is demonstrated beyond reasonable doubt. Baker, 330 N.C. at 334-35, 410 S.E.2d at 889; see also Preston, 325 N.C. at 449, 385 S.E.2d at 478 (stating that an act of the General Assembly will be declared unconstitutional only when “it [is] plainly and clearly the case” (quoting Glenn v. Bd. of Educ., 210 N.C. 525, 529-30, 187 S.E. 781, 784 (1936))). Next, when the constitutionality of a legislative act depends on the existence or nonexistence of certain facts or circumstances, we will presume the existence or nonexistence of such facts or circumstances, if reasonable, to give validity to the statute. In re Hous. Bonds, 307 N.C. at 59, 296 S.E.2d at 285 (citing Martin v. N.C. Hous. Corp., 277 N.C. 29, 44, 175 S.E.2d 665, 673 (1970)). Further, a facial challenge to the constitutionality of an act, as plaintiffs have presented here, is the most difficult challenge to mount successfully. Beaufort Cty. Bd. of Educ. v. Beaufort Cty. Bd. of Comm’rs, 363 N.C. 500, 502, 681 S.E.2d 278, 280 (2009) (citations omitted). “We seldom uphold facial challenges because it is the role of the legislature, rather than this Court, to balance disparate interests and find a workable compromise among them.” Id. (citation omitted); see also Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 450-51, 128 S. Ct. 1184, 1191 (2008) (discussing why facial challenges are disfavored). Accordingly, we require the party making the facial challenge to meet the high bar of showing “that there are no circumstances under which the statute might be constitutional.” Beaufort Cty. Bd. of Educ., 363 N.C. at 502, 681 S.E.2d at 280 (citation omitted); see also United States v. Salerno, 481 U.S. 739, 745, 107 S. Ct. 2095, 2100 (1987) (“[T]he challenger must establish that no set of circumstances exists under which the [a]ct would be valid. The fact that the [act] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid_”). It is through this lens of constitutional review that we begin our analysis in this case.
A
 The first question presented by defendants’ appeal is whether Article IX, Section 6 of the state constitution prohibits the General Assembly *132 from appropriating tax revenues to the Opportunity Scholarship Program, which is not part of our public school system.
Defendants contend that Article IX, Section 6 should not be read as a limitation on the State’s ability to spend on education generally. In plaintiffs’ view, however, even when the General Assembly explicitly intends, as it did here, to appropriate money for educational scholarships to nonpublic schools, the plain text of Article IX, Section 6 prohibits that option and requires that any and all funds for education be appropriated exclusively for our public school system.
Entitled “State school fund,” Article IX, Section 6 provides:
The proceeds of all lands that have been or hereafter may be granted by the United States to this State, and not otherwise appropriated by this State or the United States; all moneys, stocks, bonds, and other property belonging to the State for purposes of public education; the net proceeds of all sales of the swamp lands belonging to the State; and all other grants, gifts, and devises that have been or hereafter may be made to the State, and not otherwise appropriated by the State or by the terms of the grant, gift, or devise, shall be paid into the State Treasury and, together with so much of the revenue of the State as may be set apart for that purpose, shall be faithfully appropriated and used exclusively for establishing and maintaining a uniform system of free public schools.
N.C. Const, art. IX, § 6.
The manifest purpose of this section is to protect the “State school fund” in order to preserve and support the public school system, not to limit the State’s ability to spend on education generally. Section 6 accomplishes this purpose by identifying sources of funding for the State school fund and mandating that funds derived by the State from these sources be “faithfully appropriated for establishing and maintaining in this State a system of free public schools.” City of Greensboro v. Hodgin, 106 N.C. 182, 186-87, 11 S.E. 586, 587-88 (1890) (quoting a previous version of the provision). The first four clauses of Section 6 identify non-revenue sources of funding, two of which appear to be mandatory and two of which appear to be within the discretion of the General Assembly to otherwise appropriate as it sees fit. The fifth clause (the revenue clause) states that a portion of the State’s revenue “may be set apart for that purpose” — meaning for the purpose of “establishing and maintaining a uniform system of free public schools.” This clause *133 recognizes that the General Assembly may choose to designate a portion of the State’s general tax revenue as an additional source of funding for the State school fund.
Thus, within constitutional limits, the General Assembly determines how much of the revenue of the State will be appropriated for the purpose of “establishing and maintaining a uniform system of free public schools.” Insofar as the General Assembly appropriates a portion of the State’s general revenues for the public schools, Section 6 mandates that those funds be faithfully used for that purpose. Article IX, Section. 6 does not, however, prohibit the General Assembly from appropriating general revenue to support other educational initiatives. See Preston, 325 N.C. at 448-49, 385 S.E.2d at 478 (“All power which is not expressly limited by the people in our State Constitution remains with the people, and an act of the people through their representatives in the legislature is valid unless prohibited by that Constitution.” (citations omitted)). Because the Opportunity Scholarship Program was funded from general revenues, not from sources of funding that Section 6 reserves for our public schools, plaintiffs are not entitled to relief under this provision.
Faithful appropriation and use of educational funds was a very real concern to the framers of our constitution. Before the introduction of Article IX, Section 6 in the 1868 Constitution, the Literary Fund, which was devoted to funding public education, was routinely threatened to be used during the Civil War to pay for other expenses and was almost completely depleted by the war’s end. See M.C.S. Noble, A History of the Public Schools of North Carolina 242-49, 272 (1930); Milton Ready, The Tar Heel State: A History of North Carolina 263 (2005). The framers of the 1868 Constitution sought to constitutionalize the State’s obligation to protect the State school fund. In so doing, our framers chose not to limit the State from appropriating general revenue to fund alternative educational initiatives. Plaintiffs’ arguments to the contrary are without merit.
Given our disposition of plaintiffs’ claim under Article IX, Section 6, we agree with defendants that plaintiffs are likewise not entitled to relief under Article IX, Section 5. Under Article IX, Section 5, “[t]he State Board of Education shall supervise and administer the free public school system and the educational funds provided for its support." N.C. Const, art. IX, § 5 (emphasis added). Because public funds may be spent on educational initiatives outside of the uniform system of free public schools, plaintiffs’ contention that funding for the Opportunity Scholarship Program should have gone to the public schools — and therefore been brought under the supervision and administration of the State Board of Education — is without merit.
*134 The final issue under Article IX presented by defendants’ appeal is whether the Opportunity Scholarship Program legislation violates Article IX, Section 2(1). Under Section 2(1), “[t]he General Assembly shall provide by taxation and otherwise for a general and uniform system of free public schools, which shall be maintained at least nine months in every year, and wherein equal opportunities shall be provided for all students.” Id. art. IX, § 2(1). Plaintiffs contend that “[i]f the uniformity clause has any substance, it means that the State cannot create an alternate system of publicly funded private schools standing apart from the system of free public schools mandated by the Constitution.”
Plaintiffs’ characterization of the Opportunity Scholarship Program is inaccurate. The Opportunity Scholarship Program legislation does not create “an alternate system of publicly funded private schools.” Rather, this legislation provides modest scholarships to lower-income students for use at nonpublic schools of their choice. Furthermore, we have previously stated that the uniformity clause requires that provision be made for public schools of like kind throughout the state. Wake Cares, Inc. v. Wake Cty. Bd. of Educ., 363 N.C. 165, 171-72, 675 S.E.2d 345, 350 (2009). The uniformity clause applies exclusively to the public school system and does not prohibit the General Assembly from funding educational initiatives outside of that system. Accordingly, the Opportunity Scholarship Program does not violate Article IX, Section 2(1).
B
The next question presented by defendants’ appeal is whether the appropriation of general revenues to fund educational scholarships for lower-income students is for a public purpose under Article V, Sections 2(1) and 2(7).
Defendants contend that providing lower-income students the opportunity to attend private school “satisfies the State’s legitimate objective of encouraging the education of its citizens.” Defendants maintain that, in satisfying this objective, appropriations directed to the Opportunity Scholarship Program are made for a public purpose. Plaintiffs contend that the program does not accomplish a public puipose because the program appropriates taxpayer money for educational scholarships to private schools without regard to whether the schools satisfy substantive education standards.
Under Article V, Section 2(1), “[t]he power of taxation shall be exercised in a just and equitable manner, for public purposes only, and shall never be surrendered, suspended, or contracted away.” N.C. Const, art. V, § 2(1). Under Article V, Section 2(7), “[t]he General Assembly may *135 enact laws whereby the State, any county, city or town, and any other public corporation may contract with and appropriate money to any person, association, or corporation for the accomplishment of public purposes only.” Id. art. V, § 2(7). Because “[t]he power to appropriate money from the public treasury is no greater than the power to levy the tax which put the money in the treasury,” we subject both legislative powers to the public purpose requirement. Mitchell v. N.C. Indus. Dev. Fin. Auth., 273 N.C. 137, 143, 159 S.E.2d 745, 749-50 (1968).
At the outset, we note that “the fundamental concept underlying the public purpose doctrine” is that “the ultimate gain must be the public’s, not that of an individual or private entity.” Maready v. City of Winston-Salem, 342 N.C. 708, 719, 467 S.E.2d 615, 622 (1996). Thus, in resolving challenges to legislative appropriations under the public purpose clause, this Court’s inquiry is discrete — we ask whether the legislative purpose behind the appropriation is public or private. See id. at 716, 467 S.E.2d at 620-21; Mitchell, 273 N.C. at 144, 159 S.E.2d at 750. If the purpose is public, then the wisdom, expediency, or necessity of the appropriation is a legislative decision, not a judicial decision. See Maready, 342 N.C. at 714, 467 S.E.2d at 619. Accordingly, our public purpose analysis does not turn on whether the appropriation will, in the words of plaintiffs, “accomplish” a public purpose.
Likewise, sustaining a legislative appropriation under the public purpose clause does not require a concurrent assessment of whether other constitutional infirmities exist that might render the legislation unconstitutional. If the challenged appropriation is constitutionally infirm on other grounds, proper redress is under the applicable constitutional provisions, not the public purpose clause. Thus, plaintiffs’ contentions that the Opportunity Scholarship Program runs afoul of Article I, Sections 15 and 19, due to scholarships being remitted to allegedly “unaccountable” schools or schools that discriminate on the basis of religion, are inap-posite to the public purpose analysis.[11]
Our inquiry under Article V, Sections 2(1) and 2(7), therefore, is whether the appropriations made by the General Assembly to fund the Opportunity Scholarship Program are for a public rather than private purpose. In addressing this question, we are mindful of the general proposition articulated by this Court over forty-five years ago: “Unquestionably, the education of residents of this State is a recognized object of State government. Hence, the provision therefor is for a public *136 purpose.” State Educ. Assistance Auth. v. Bank of Statesville, 276 N.C. 576, 587, 174 S.E.2d 551, 559 (1970) (citing Jamison v. City of Charlotte, 239 N.C. 682, 696, 80 S.E.2d 904, 914 (1954); Green v. Kitchin, 229 N.C. 450, 455, 50 S.E.2d 545, 549 (1948)).
In determining whether a specific appropriation is for a public purpose, “[t]he term ‘public purpose’ is not to be narrowly construed.” Madison Cablevision, Inc. v. City of Morganton, 325 N.C. 634, 646, 386 S.E.2d 200, 207 (1989) (citing Briggs v. City of Raleigh, 195 N.C. 223, 226, 141 S.E. 597, 599 (1928)). We have also specifically “declined to ‘confine public purpose by judicial definition^ leaving] “each case to be determined by its own peculiar circumstances as from time to time it arises.” ’ ” Maready, 342 N.C. at 716, 467 S.E.2d at 620 (alteration in original) (quoting Stanley v. Dep’t of Conservation & Dev., 284 N.C. 15, 33, 199 S.E.2d 641, 653 (1973)). Indeed, “[a] slide-rule definition to determine public purpose for all time cannot be formulated; the concept expands with the population, economy, scientific knowledge, and changing conditions.” Id. (quoting Mitchell, 273 N.C. at 144, 159 S.E.2d at 750). Although the initial determination of the General Assembly in passing the law is given “great weight” by this Court, Madison Cablevision, 325 N.C. at 644-45, 386 S.E.2d at 206, “the ultimate responsibility for the public purpose determination rests, of course, with this Court,” id. at 645, 386 S.E.2d at 206. “[T]wo guiding principles have been established for determining that a particular undertaking by [the State] is for a public purpose: (1) it involves a reasonable connection with the convenience and necessity of the [State]; and (2) the activity benefits the public generally, as opposed to special interests or persons.” Maready, 342 N.C. at 722, 467 S.E.2d at 624 (quoting Madison Cablevision, 325 N.C. at 646, 386 S.E.2d at 207 (citations omitted)).
“As to the first prong, whether an activity is within the appropriate scope of governmental involvement and is reasonably related to communal needs may be evaluated by determining how similar the activity is to others which this Court has held to be within the permissible realm of governmental action.” Id.) see also Green v. Kitchin, 229 N.C. 450, 455, 50 S.E.2d 545, 549 (1948) (“A tax or an appropriation is certainly for a public purpose if it is for the support of government, or for any of the recognized objects of government.” (citations omitted)). Here, the provision of monetary assistance to lower-income families so that their children have additional educational opportunities is well within the scope of permissible governmental action and is intimately related to the needs of our state’s citizenry. See State Educ. Assistance Auth., 276 N.C. at 587, 174 S.E.2d at 559 (“Unquestionably, the education of residents *137 of this State is a recognized object of State government.”); see also Rowan Cty. Bd. of Educ. v. U.S. Gypsum Co., 332 N.C. 1, 10, 418 S.E.2d 648, 655 (1992) (“Education is a governmental function so fundamental in this state that our constitution contains a separate article entitled ‘Education.’ ”); Delconte v. State, 313 N.C. 384, 401-02, 329 S.E.2d 636, 647 (1985) (“We also recognize that the state has a compelling interest in seeing that children are educated and may, constitutionally, establish minimum educational requirements and standards for this education.”).
In State Education Assistance Authority v. Bank of Statesville, for example, we approved the use of revenue bond proceeds to “make loans to meritorious North Carolinians of slender means” for the purpose of “minimiz [ing] the number of qualified persons whose education or training is interrupted or abandoned for lack of funds.” 276 N.C. at 587, 174 S.E.2d at 559. Observing that “[t]he people of North Carolina constitute our State’s greatest resource,” we held that “bond proceeds are used for a public purpose when used to make such loans.” Id.
Similarly, in Hughey v. Cloninger we addressed the legality of an appropriation made by the Gaston County Board of Commissioners to a private school for dyslexic children. 297 N.C. 86, 88, 95, 253 S.E.2d 898, 900, 903 (1979). Although we held that the Board of Commissioners lacked statutory authority to make such an appropriation, we stated, albeit in obiter dictum, that had there been statutory authority, such an appropriation “would have presented no ‘public purpose’ difficulties as it is well established that both appropriations and expenditures of public funds for the education of the citizens of North Carolina are for a public purpose.” Id. at 95, 253 S.E.2d at 903-04. We therefore conclude that the appropriations made to the Opportunity Scholarship Program involve a “reasonable connection with the convenience and necessity of the [State].” Maready, 342 N.C. at 722, 467 S.E.2d at 624 (quoting Madison Cablevision, 325 N.C. at 646, 386 S.E.2d at 207).
As to the second prong of the public purpose inquiry, whether “the activity benefits the public generally, as opposed to special interests or persons,” id. (quoting Madison Cablevision, 325 N.C. at 646, 386 S.E.2d at 207), “[i]t is not necessary, in order that a use may be regarded as public, that it should be for the use and benefit of every citizen in the community,” id. at 724, 467 S.E.2d at 625 (quoting Briggs, 195 N.C. at 226, 141 S.E. at 599-600). “[A]n expenditure does not lose its public purpose merely because it involves a private actor. Generally, if an act will promote the welfare of a state or a local government and its citizens, it is for a public purpose.” Id.) see also State Educ. Assistance Auth., 276 N.C. *138 at 588, 174 S.E.2d at 560 (“[T]he fact that the individual obtains a private benefit cannot be considered sufficient ground to defeat the execution of ‘a paramount public purpose.’ ” (quoting Clayton v. Kervick, 52 N.J. 138, 155, 244 A.2d 281, 290 (1968))).
The promotion of education generally, and educational opportunity in particular, is of paramount public importance to our state. Indeed, borrowing language from the Northwest Ordinance of 1787, our constitution preserves the ethic of educational opportunity, declaring that “[rjeligion, morality, and knowledge being necessary to good government and the happiness of mankind, schools, libraries, and the means of education shall forever be encouraged.” N.C. Const, art. IX, § 1 (emphasis added). Although the scholarships at issue here are available only to families of modest means, and therefore inure to the benefit of the eligible students in the first instance, and to the designated nonpublic schools in the second, the ultimate beneficiary of providing these children additional educational opportunities is our collective citizenry. Cf. Maready, 342 N.C. at 724, 467 S.E.2d at 625 (recognizing that an expenditure providing an “incidental private benefit” is for a public purpose if it serves “a primary public goal”). Accordingly, the appropriations made by the General Assembly for the Opportunity Scholarship Program were for a public purpose under Article V, Sections 2(1) and 2(7).
C
The next issue presented by defendants’ appeal concerns the independent applicability, if any, of Article I, Section 15 to plaintiffs’ claims. Article I, Section 15 declares: “The people have a right to the privilege of education, and it is the duty of the State to guard and maintain that right.” N.C. Const. art. I, § 15. This constitutional provision states a general proposition concerning the right to the privilege of education, the substance of which is detailed in Article IX. Article I, Section 15 is not an independent restriction on the State. See generally John V. Orth & Paul Martin Newby, The North Carolina State Constitution 62-63 (2d ed. 2013).
Plaintiffs rely on Article I, Section 15 and Leandro v. State, 346 N.C. 336, 488 S.E.2d 249 (1997), a case challenging the adequacy of public school funding, for the proposition that “public funds spent for education must go to institutions that will provide meaningful educational services — specifically, to institutions with a sufficient curriculum and competent teachers.” Because the Opportunity Scholarship Program legislation does not require that participating nonpublic schools meet the sound basic education standard announced in Leandro, 346 N.C. *139 at 347, 488 S.E.2d at 255, or impose regulatory standards approximating those placed on our public schools in Chapter 115C of the General Statutes, plaintiffs contend that the scholarship program accomplishes no public purpose and is constitutionally inadequate.[12]
As stated above, Article I, Section 15 has no effect on our disposition with respect to plaintiffs’ public purpose claim. In its order and final judgment, however, the trial court purported to grant independent relief to plaintiffs under Article I, Section 15, concluding that the Opportunity Scholarship Program legislation fails to “ ‘guard and maintain’ the right of the people to the privilege of education” by “appropriating taxpayer funds to educational institutions that are not required to meet educational standards” and by “expending public funds so that children can attend private schools.” To the extent that plaintiffs rely on Article I, Section 15 as an independent basis of relief, we agree with defendants that such reliance is misplaced.
It is axiomatic that the responsibility Leandro places on the State to deliver a sound basic education has no applicability outside of the education delivered in our public schools. In Leandro we stated that a public school education that “does not serve the purpose of preparing students to participate and compete in the society in which they live and work is devoid of substance and is constitutionally inadequate.” 346 N.C. at 345, 488 S.E.2d at 254. We concluded that “Article I, Section 15 and Article IX, Section 2 of the North Carolina Constitution combine to guarantee every child of this state an opportunity to receive a sound basic education in our public schools.” Id. at 347, 488 S.E.2d at 255 (emphases added). Thus, Leandro does not stand for the proposition that Article I, Section 15 independently restricts the State outside of thé public school context.
Furthermore, our constitution specifically envisions that children in our state may be educated by means outside of the public school system. See N.C. Const, art. IX, § 3 (“The General Assembly shall provide *140 that every child of appropriate age and of sufficient mental and physical ability shall attend the public schools, unless educated by other means." (emphasis added)); see also Delconte, 313 N.C. at 385, 400-01, 329 S.E.2d at 638, 646-47 (concluding that home school instruction did not violate compulsory attendance statutes and noting that a contrary holding would raise a serious constitutional question under the North Carolina Constitution). Thus, even if Article I, Section 15 could serve as an independent basis of relief, there is no merit in the argument that a legislative program designed to increase educational opportunity in our state is one that fails to “guard and maintain” the “right to the privilege of education.”
The final issue presented by defendants’ appeal concerns plaintiffs’ Article I, Section 19 religious discrimination claim. Article I, Section 19 declares, in pertinent part, “[n]o person shall be denied the equal protection of the laws; nor shall any person be subjected to discrimination by the State because of race, color, religion, or national origin.” N.C. Const, art. I, § 19 (emphasis added). Plaintiffs couch their religious discrimination claim, both for justiciability purposes and with respect to the merits of the claim, in terms of the public purpose doctrine. In short, plaintiffs contend that the Opportunity Scholarship Program accomplishes no public purpose because it allows funding for educational scholarships to schools that may discriminate on the basis of religion. Again, our analysis of the public purpose doctrine made clear that Article I, Section 19, like Article I, Section 15, has no effect on our disposition with respect to plaintiffs’ public purpose claim.
With respect to the independent applicability of Article I, Section 19 as a stand-alone claim, defendants have maintained throughout this litigation that such a claim is not justiciable in this case because plaintiffs, as taxpayers of the state, lack standing. Specifically, defendants contend that plaintiffs have suffered no injury in fact because they are not in the class of persons against which the program allegedly discriminates. We agree and therefore hold that plaintiffs’ Article I, Section 19 claim must be dismissed.
Generally, “a taxpayer has standing to bring an action against appropriate government officials for the alleged misuse or misappropriation of public funds.” Goldston v. State, 361 N.C. 26, 33, 637 S.E.2d 876, 881 (2006). Yet, “[a] taxpayer, as such, does not have standing to attack the constitutionality of any and all legislation.” Nicholson v. State Educ. Assistance Auth., 275 N.C. 439, 447, 168 S.E.2d 401, 406 (1969) (citations omitted). “[A] person who is seeking to raise the question as to the validity of a discriminatory statute has no standing for that purpose *141 unless he belongs to the class which is prejudiced by the statute.” In re Martin, 286 N.C. 66, 75, 209 S.E.2d 766, 773 (1974) (quoting 16 Am. Jur. 2d Constitutional Law § 123 (1964)). Here plaintiffs are taxpayers of the state, not eligible students alleged to have suffered religious discrimination as a result of the admission or educational practices of a nonpublic school participating in the 'Opportunity Scholarship Program. Because eligible students are capable of raising an Article I, Section 19 discrimination claim on their own behalf should the circumstances warrant such action, plaintiffs have no standing to assert a direct discrimination claim on the students’ behalf.
IV
“The General Assembly has the right to experiment with new modes of dealing with old evils, except as prevented by the Constitution.” Redev. Comm’n v. Sec. Nat’l Bank of Greensboro, 252 N.C. 595, 612, 114 S.E.2d 688, 700 (1960); see also New State Ice Co. v. Liebmann, 285 U.S. 262, 311, 52 S. Ct. 371, 386-87 (1932) (Brandéis & Stone, JJ., dissenting) (indicating that an individual state may serve as a laboratory of democracy and experiment with new legislation in order to meet changing social and economic needs). In this case the General Assembly seeks to improve the educational outcomes of children in lower-income families. The mode selected by the General Assembly to effectuate this policy objective is the Opportunity Scholarship Program.
When, as here, the challenged legislation comports with the constitution, the wisdom of the enactment is a decision for the General Assembly. As this Court has previously recognized, “[i]t may be that the measure may prove eventually to be a disappointment, and is ill advised, but the wisdom of the enactment is a legislative and not a judicial question.” Sec. Nat’l Bank of Greensboro, 252 N.C. at 612, 114 S.E.2d at 700. To the extent that plaintiffs disagree with the General Assembly’s educational policy decision as expressed in the Opportunity Scholarship Program, their remedy is with the legislature, not the courts. Our review is limited to a determination of whether plaintiffs have demonstrated that the program legislation plainly and clearly violates our constitution. Plaintiffs have made no such showing in this case. Accordingly, the trial court erred in declaring the Opportunity Scholarship Program unconstitutional. We therefore reverse the trial court’s order and final judgment.
REVERSED.

. See N.C. Const. art. IV, § 1; Bayard v. Singleton, 1 N.C. 5 (1787) (recognizing the courts’ power of judicial review and declaring unconstitutional an act of the legislature infringing upon the right to a trial by jury)-

. In the first year of the Opportunity Scholarship Program, 2300 students were selected to participate. The average daily membership in our State’s public and charter schools is approximately 1.5 million students. N.C. Dep’t of Pub. Instruction, Facts and Figures 2012-13, http://www.dpi.state.nc.us/docs/fbs/resources/data/factsfigures/2012-13figures.pdf (last visited July 21, 2015) (reporting a combined average daily membership of 1,492,793 in public and charter schools during calendar year 2012-13).

. N.C. Dep’t of Pub. Instruction, 2013-14 School Report Cards, NC School Report Cards, http://www.ncpublicschools.org/src/ (last visited July 21, 2015).

. This foundational principle of constitutional law is well established in North Carolina. See N.C. Const, art I, § 6 (“The legislative, executive, and supreme judicial powers of the State government shall be forever separate and distinct from each other.”); see also id. art. II (describing the legislative sphere of authority); id. art. in (describing the executive sphere of authority); id. art. IV (describing the judicial sphere of authority).

. The Opportunity Scholarship Program was ratified by the General Assembly and signed into law by the Governor in July 2013 as part of the “Current Operations and Capital Improvements Appropriations Act of 2013” — the State’s budget bill for fiscal years 2013-14 and 2014-15. Current Operations and Capital Improvements Appropriations Act of 2013, ch. 360, sec. 8.29, 2013 N.C. Sess. Laws 99B, 1064-69. The program was amended in August of 2014 to its present form, The Current Operations and Capital Improvements Appropriations Act of 2014, ch. 100, sec. 8.26, 2013 N.C. Sess. Laws (Reg. Sess. 2014) 328, 371-73, and is codified as amended in Part 2A to Article 39 of Chapter 115C of the General Statutes, N.C.G.S. §§ 115C-562.1 through-562.7 (2013 & Supp. 2014).

. Although plaintiffs generally represent a cross section of individuals who currently interact or have previously interacted with our state’s public schools, plaintiffs’ complaint in the present action was made in their capacity as taxpayers of the state.

. Plaintiffs’ allegations concerning a nonpublic school’s ability to discriminate based on race, color, or national origin were rendered moot by the passage of N.C.G.S. § 115C-562.5(cl). See ch. 100, sec. 8.25(d), 2013 N.C. Sess. Laws (Reg. Sess. 2014) at 371.

. For purposes of this opinion, we will refer to defendants and intervenor-defen-dants collectively as “defendants.”

. We also certified the companion case of Richardson v. State, No. 384A14, for immediate review, which we decide today in a separate opinion.

. Plaintiffs have not presented any claims under the United States Constitution.

. The independent applicability of Article I, Sections 15 and 19, in this case is discussed in Part HI(C) of our opinion.

. Plaintiffs acknowledge that at least some nonpublic schools may be able to provide scholarship students a meaningful education. Even so, plaintiffs contend that “[t]he State has an affirmative obligation to ensure that public funds are used to accomplish a public purpose” and that, without built-in accountability standards, the State cannot ensure that the Opportunity Scholarship Program will accomplish its intended purposes as to each scholarship recipient. In making this argument, plaintiffs would require the State to demonstrate that the program operates constitutionally in all circumstances, rather than accepting the burden of showing that there is no set of circumstances under which the law could operate in a constitutional manner.