IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA14-1115

Filed: 1 September 2015

Wake County, No. 12 CVS 002414

RICHMOND COUNTY BOARD OF EDUCATION, Plaintiff,

v.

JANET COWELL, NORTH CAROLINA STATE TREASURER, in her official capacity only, DAVID T. MCCOY, NORTH CAROLINA STATE CONTROLLER, in his official capacity only, ART POPE, NORTH CAROLINA STATE BUDGET DIRECTOR, in his official capacity only, FRANK L. PERRY, SECRETARY OF THE NORTH CAROLINA DEPARTMENT OF PUBLIC SAFETY, in his official capacity only, ROY COOPER, ATTORNEY GENERAL OF THE STATE OF NORTH CAROLINA, in his official capacity only, Defendants.

Appeal by Defendants from orders entered 23 May 2012 by Judge W. Osmand Smith, III, and 27 June 2014 by Judge Michael R. Morgan in Wake County Superior Court. Heard in the Court of Appeals 16 March 2015.

> *George E. Crump, III, for the Plaintiff-Appellee.*

> *Attorney General Roy A. Cooper, III, by Solicitor General John F. Maddrey, Assistant Solicitor General Gary R. Govert, and Special Deputy Attorney General Joseph Finarelli, for the Defendants-Appellants.*

DILLON, Judge.

I. Background

The question presented in this appeal is whether N.C. Gen. Stat. § 7A-304(a)(4b) violates Article IX, Section 7(a) of the North Carolina Constitution.

Article IX, Section 7(a) mandates that the "clear proceeds" of all fines, penalties and forfeitures collected for the breach of the penal laws of the State "shall belong to" the counties and be "used exclusively for maintaining" our public schools. N.C. Const. art. IX, § 7(a) (2011).

N.C. Gen. Stat. § 7A-304(a)(4b) requires that individuals convicted of an improper equipment offense under our motor vehicle laws pay a $50.00 surcharge, in addition to any other penalty or cost authorized by law, and directs that the proceeds from the collection of this $50.00 surcharge be remitted to a fund administered by the State and used to pay counties to house certain misdemeanor offenders in their jails (the "State Confinement Fund"). *See also Justice Reinvestment Act of 2011*, 2011 N.C. Sess. Laws 192, §§ 7(a)-(c), (e) (codified at N.C. Gen. Stat. §§ 15A-1352, 148-32.1(b1), (b2) (2011)) (providing for inmate housing in county jails for misdemeanants whose sentences exceed ninety days).

The Richmond County Board of Education ("Plaintiff") commenced this action, contending that the $50.00 surcharge falls within the ambit of Article IX, Section 7(a) of our State Constitution and, therefore, the clear proceeds therefrom must be used to fund education rather than be contributed to the State Confinement Fund. In this action, Plaintiff seeks a declaratory judgment that it is entitled to the $50.00 surcharge revenue collected in Richmond County and a monetary judgment in the amount equal to the total $50.00 surcharge revenue collected in Richmond County

that has been remitted to the State Confinement Fund. Defendants are executive officers of the State of North Carolina involved in the administration of State funds and are being sued in their official capacities only.[1]

All parties moved for summary judgment. The trial court granted summary judgment in favor of Plaintiff and denied Defendants' motion for summary judgment. Defendants appeal.[2] For the following reasons, we affirm.

## II. Standard of Review

As this case is factually uncontested and involves the interpretation of statutes and our State Constitution, our review is *de novo*. *Shavitz v. City of High Point*, 177 N.C. App. 465, 473-74, 630 S.E.2d 4, 11 (2006).

## III. Analysis

Our courts have "the authority and responsibility to declare a law unconstitutional," but only "when the [constitutional] violation is plain and clear." *Hart v. State*, No. 372A14 at 3, 2015 N.C. LEXIS 655 *3, 2015 WL 4488553 *1 (N.C. July 23, 2015). In determining whether our General Assembly has exceeded its constitutional authority in the enactment of legislation, we must be mindful – as our Supreme Court has recently held – that the North Carolina Constitution "is not a

---

[1]We granted Plaintiff's uncontested motion for substitution of parties replacing David T. McCoy and Art Pope as Defendants with Linda Combs and Lee Roberts, respectively.

[2]This appeal is the second in this proceeding. In the first appeal, we affirmed the trial court's denial of Defendants' motion to dismiss based on sovereign immunity and on lack of standing. *Richmond Cnty. Bd. of Educ. v. Cowell*, ___ N.C. App. ___, 739 S.E.2d 566 (2013).

grant of power, but a limit on the otherwise plenary police power of the State." *Id.* at 11, 2015 N.C. LEXIS 655 *13, 2015 WL *5.

On appeal, Defendants argue (1) that the trial court erred in concluding that the $50.00 surcharge falls within the ambit of Article IX, Section 7; and, (2) assuming the trial court did not so err, that the trial court otherwise erred in ordering Defendants to repay "all sums" generated by the $50.00 surcharge in Richmond County rather than some lesser amount representing the "clear proceeds" of the $50.00 surcharge revenue.[3]  We address each argument in turn.

### A. The North Carolina Constitution Prohibits our General Assembly from Appropriating the $50.00 Surcharge Revenue to House Prisoners

We hold that the trial court correctly concluded that the $50.00 surcharge falls within the ambit of Article IX, Section 7(a).  Therefore, our General Assembly exceeded its constitutional powers by enacting legislation which directs that the revenue from the $50.00 surcharge collected in Richmond County be remitted to the State Confinement Fund to pay for the housing of prisoners.

We begin this portion of our analysis with a brief review of the historical context surrounding the adoption of Article IX, Section 7(a) of our Constitution.  We

---

[3]In its brief, Plaintiff argues that the trial court erred in limiting its award to the $50.00 surcharges collected in Richmond County, and not granting relief to the local school administrative units in all 100 counties.  However, Plaintiff has not cross-appealed.  Therefore, this argument has been not been properly preserved for our review. *See, e.g.*, *Bd. or Dirs. of Queens Towers Homeowners' Ass'n, Inc. v. Rosenstadt*, 214 N.C. App. 162, 169, 714 S.E.2d 765, 770 (2011) ("[T]he proper procedure for presenting alleged errors that purport to show that the judgment was erroneously entered and that an altogether different kind of judgment should have been entered is a cross-appeal.").  Furthermore, the local school administrative units of the other 99 counties in our State are not parties to this action.

then turn to our Supreme Court's watershed decision in *Mussallam v. Mussallam*, 321 N.C. 504, 364 S.E.2d 364 (1988), in which it interpreted the phrase "penal law" within the meaning of Article IX, Section 7(a) expansively, to include not only criminal laws, but all "[punitive] laws that impose a monetary payment for their violation." *Id.* at 509, 364 S.E.2d at 367. Applying the interpretation established by *Mussallam* to the present case, we then conclude that the $50.00 surcharge imposed by N.C. Gen. Stat. § 7A-304(a)(4b) is punitive in nature and, furthermore, that the surcharge is imposed for a breach of the penal laws of our State, notwithstanding that violating the statute is not a crime. Therefore, we hold that the $50.00 surcharge falls within the ambit of Article IX, Section 7(a).

The pertinent language in Article IX, Section 7(a) became part of our State Constitution in 1875. *See* David M. Lawrence, *Fines, Penalties, and Forfeitures: An Historical and Comparative Analysis*, 65 N.C. L. Rev. 49, 60 (1986). Article IX, Section 7(a) specifically states as follows:

> [T]he clear proceeds of all penalties and forfeitures and of all fines collected in the several counties for any breach of the penal laws of the State, shall belong to and remain in the several counties, and shall be faithfully appropriated and used exclusively for maintaining free public schools.

N.C. Const. art. IX, § 7(a) (2011). Troubled by the historic disregard displayed by our General Assembly in failing to fund public education adequately, the framers of Article IX, Section 7(a) adopted the provision for the purpose of dedicating certain

revenue to education, thereby limiting the power of the General Assembly to appropriate said revenue for any other purpose. *See* Lawrence, *supra* at 59-60.

Prior to the Civil War, public school funding was left entirely to legislative control, with no constitutional restrictions placed on our General Assembly. *Bd. of Educ. of Vance Cnty. v. Town of Henderson*, 126 N.C. 689, 698, 36 S.E. 158, 161 (1900) (Faircloth, J., concurring in result). In 1825, the General Assembly established a statewide Literary Fund, directing that the profits derived therefrom pay "for the support of the common and convenient Schools" of our State.[4] Lawrence, *supra* at 53. However, during the Civil War, the General Assembly regularly raided the Literary Fund; and, as recently noted by our Supreme Court, the Fund "was almost completely depleted by war's end." *Hart* at 15, 2015 N.C. LEXIS 655 *18, 2015 WL *7.

Following the Civil War, the framers of the Constitution of 1868 were interested in establishing a *constitutionally*-protected fund dedicated to public education. *Id.* Accordingly, the framers incorporated a provision requiring that certain sources of revenue – including, among other sources, the net proceeds of fines, penalties, and forfeitures – be placed in a State "irreducible educational fund." N.C.

---

[4]The Literary Fund was largely comprised of stock in North Carolina-chartered banks, including the Bank of Newbern and the Bank of Cape Fear, the first banks chartered in our State. *See* M.C.S. Noble, *A History of the Public Schools of North Carolina* 45-48 (1930). In fact, the Bank of Newbern's Raleigh branch was located adjacent to our Capitol in a building that was eventually torn down in 1911 to make way for the Ruffin Building, which housed our Supreme Court from 1913 to 1938, and houses our Court today. *See* E.C. Waugh, *North Carolina's Capital, Raleigh* 38 (1967).

Const. art. IX, § 4 (1868) (stating further that this fund was to be "sacredly preserved" and "faithfully appropriated for establishing and perfecting . . . a system of Free Public Schools"). The framers also included a provision requiring the respective counties to support the public schools, in recognition of the importance of their role in our State's public education system. *See id.* § 3 (providing that each county must maintain the public schools therein for at least four months of each year, and that county commissioners who fail in this requirement "shall be liable to indictment").

However, despite strong language prohibiting the use of the money in the newly constitutionalized education fund for any other purpose, its diversion by our General Assembly continued, and because the assets in the fund were meager to begin with, little money from it ever reached our State's public schools. *See* Lawrence, *supra* at 59. Furthermore, many counties struggled to meet their obligations under the new constitutional provisions because county commissioners could not levy taxes without voter approval. *See Lane v. Stanly*, 65 N.C. 153, 156 (1871). Thus, against the backdrop of a history of inadequate public school funding, legislative diversion of constitutionally dedicated funds, and the impotence of local government, the framers of the Constitution of 1875 adopted the language in Article IX, Section 7(a) for the purpose of securing *to each county* a constitutionally-protected source of revenue to aid in meeting its obligation to support our State's public schools. *See* Lawrence, *supra* at 58-60.

In *Mussallam v. Mussallam*, 321 N.C. 504, 364 S.E.2d 364 (1988), our Supreme Court – recognizing that the scope of Article IX, Section 7(a) only extends to the clear proceeds of fines, penalties, and forfeitures collected "for [] breach of the penal laws of the State" – interpreted the phrase "penal laws" within the meaning of this provision broadly, to include not only fines imposed for violations of criminal law, but also other noncriminal "laws that impose a monetary payment for their violation." *Id.* at 509, 364 S.E.2d at 367. Specifically, the Court held that the constitutional provision creates "two distinct funds for the public schools." *Id.* at 509, 364 S.E.2d at 366. First, the Court identified the revenue derived from the collection of fines for violation of our State's *criminal* laws as subject to the provision, observing that "[o]ne could not legitimately argue that the violation of a criminal law is not a 'breach of the penal laws.'" *Id.* at 509, 364 S.E.2d at 367. However, the Court went on to interpret the phrase "penal laws" to include all "laws that impose a monetary payment for their violation," provided that "[t]he payment is punitive rather than remedial in nature and is intended to penalize the wrongdoer rather than compensate a particular party." *Id.* Accordingly, under *Mussallam*, the test is whether the imposition of payment for the violation of a statute is punitive or remedial in nature. *Id.*

Applying *Mussallam* to the present case, we note initially that the $50.00 surcharge is imposed on individuals "convicted" of an improper equipment "offense."

*See* N.C. Gen. Stat. § 7A-304(a)(4b) (2011). Specifically, N.C. Gen. Stat. § 7A-304(a)(4b) provides:

> To provide for contractual services to reduce county jail populations, the sum of fifty dollars ($50.00) for all offenses arising under Chapter 20 of the General Statutes and resulting in a *conviction* of an improper equipment *offense*, to be remitted to the [Statewide Confinement Fund].

*Id.* (emphasis added). Improper equipment offenses are found generally in Chapter 20, Article 3, Part 9 of our General Statutes, entitled "The Size, Weight, Construction and Equipment of Vehicles." *See, e.g.*, *id.* § 20-115 ("It shall be unlawful for any person to drive . . . any vehicle . . . which are not so . . . equipped as required in this title"). Improper equipment offenses are infractions. *Id.* § 20-176(a). As such, they are not crimes. *Id.* § 14-3.1 (defining "infraction" as "a noncriminal violation of law not punishable by imprisonment"). However, though violations of these statutes do not constitute crimes, such violations nonetheless constitute "breach[es] of the penal laws of the State" within the meaning of Article IX, Section 7(a). *See, e.g.*, *id.* (imposing "a penalty of not more than one hundred dollars"). We note that the additional $50.00 surcharge is imposed *only* on those individuals who have been found responsible for an improper equipment offense. *See id.* § 7A-304(a)(4b).

Furthermore, the monetary penalty imposed for committing an improper equipment offense under Chapter 20 of the General Statutes is punitive rather than remedial in nature. The imposition of this payment, therefore, falls within the ambit

of Article IX, Section 7(a). *See Mussallam*, 321 N.C. at 509, 364 S.E.2d at 367. We are mindful that the General Assembly has affixed the label "cost" to this surcharge, suggesting that it is remedial. *See* N.C. Gen. Stat. § 7A-304(a) (2011). Our Supreme Court, however, has held that "the label attached . . . does not control," *see Cauble v. City of Asheville*, 301 N.C. 340, 344, 271 S.E.2d 258, 260 (1980), though we are to *consider* the label used by the General Assembly in deciding "whether the payment . . . comes within the purview of Article IX, Section 7," *see North Carolina Sch. Bds. Ass'n v. Moore*, 359 N.C. 474, 488, 614 S.E.2d 504, 512 (2005). However, based on how our General Assembly has directed that the proceeds from the $50.00 surcharge are to be used and based on our Supreme Court's decisions interpreting the language in Article IX, Section 7(a), we hold that the $50.00 surcharge *is* punitive, rather than remedial, in nature. While not all monetary payments imposed on those who violate our State's noncriminal laws fall within the ambit of Article IX, Section 7(a), our Supreme Court has recognized that there are limitations "as to the purposes for which monies may be used and still be considered 'remedial.'" *Id.* at 496, 614 S.E.2d at 517. It is "plain *and* clear," here, that the $50.00 surcharge is not remedial because the revenue generated therefrom is not used to reimburse the State for an expense incurred because of improper equipment violations. Instead, the revenue is used to house prisoners, *see* N.C. Gen. Stat. § 7A-304(a)(4b), and imprisonment is not even a

possible punishment for the commission of an improper equipment offense, *see id.* § 14-3.1.

Based on our conclusion that the $50.00 surcharge authorized by N.C. Gen. Stat. § 7A-304(a)(4b) falls within the ambit of Article IX, Section 7(a) of the North Carolina Constitution, Defendants' first argument is overruled.

## B. Defendants Must Repay "All Sums"

Defendants next argue that the trial court erred in ordering it to pay back "all" of the proceeds received into the State Confinement Fund from the $50.00 surcharge revenue collected in Richmond County, contending that Plaintiff is only entitled to the "clear proceeds" therefrom. We disagree.

Defendants are correct that Article IX, section 7(a) requires *only* the "clear proceeds" from fines, penalties, and forfeitures within its ambit be used for public education. *See, e.g.*, *Cauble*, 301 N.C. at 345, 271 S.E.2d at 261. Defendants, therefore, argue that "the remedy ordered by the [trial] court was incorrect[,]" citing N.C. Gen. Stat. § 115C-437, which provides a definition of "clear proceeds" as the full amount "diminished only by the actual costs of collection, not to exceed ten percent (10%) of the amount collected."

The trial court, however, did not order "all sums" to be paid to Plaintiff (Richmond County Board of Education), but rather to "Richmond County." We construe "Richmond County" in the trial court's order as its clerk of superior court.

The $50.00 surcharges were originally paid by the improper equipment offenders into the clerk's office. That office was required to remit the money to the State Confinement Fund pursuant to N.C. Gen. Stat. § 7A-304(a)(4b). However, as we have declared that the remittance of the $50.00 surcharges collected in Richmond County to the State Confinement Fund is unconstitutional, we hold it is appropriate – as the trial court ordered – that this money be paid back to the clerk's office in Richmond County. It will then be the duty of the clerk's office to disburse this money properly pursuant to N.C. Gen. Stat. § 115C-452, which provides that "[t]he clear proceeds of all penalties and forfeitures and of all fines collected in the General Court of Justice in each county shall be remitted *by the clerk of the superior court* to the county finance officer [to be further remitted to the local school administrative unit(s) in the county.]" *Id.* (emphasis added).[5] We note that Plaintiff is the sole local school administrative unit in Richmond County.

IV. Conclusion

For the foregoing reasons, we affirm the trial court's order denying Defendants' motion for summary judgment and granting summary judgment in favor of Plaintiff.

---

[5]Another statute – N.C. Gen. Stat. § 115C-457.1 – addresses the proper disposition of civil fines, penalties, and forfeitures collected *by a State agency*, as opposed to those collected in the General Court of Justice. Specifically, pursuant to authority granted by Article IX, Section 7(b) of our State Constitution, our General Assembly directs that these civil fines, penalties, and forfeitures are not to be remitted to the finance officer of the county where collected, but rather to the State to be placed into the Civil Penalty and Forfeiture Fund.

AFFIRMED.

Judges STROUD and DAVIS concur.