IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-409

Filed 15 April 2026

Guilford County, No. 19E001014-400

IN THE MATTER OF THE LAST WILL AND TESTAMENT OF PAMELA FIELDS WEST, DECEASED

Appeal by Caveators from order and judgment entered 19 September 2024 by Judge Lori I. Hamilton in Guilford County Superior Court. Heard in the Court of Appeals 14 January 2026.

> *Dowling PLLC, by Troy D. Shelton and Hall Booth Smith, P.C., by Peter O'Connell, for the Caveators-Appellants.*
>
> *Roberson Haworth & Reese, P.L.L.C, by Zachary W. Green and Shane T. Stutts, for the Propounder-Appellee.*

WOOD, Judge.

Marie Fields ("Marie"), Abigail Fields-Jones ("Abigail"), and Paula Fields ("Paula") (together "Caveators") appeal from an order and judgment granting Danny West's ("Propounder's") motion for directed verdict. On appeal, Caveators contend the trial court erred by granting Propounder's motion for directed verdict on the issues of undue influence and duress. After careful review of the record, we conclude the trial court erred in granting Propounder's motion for directed verdict. We reverse the trial court's order and remand for a new trial on the issues of undue influence and

duress.

## I. Factual and Procedural Background

According to our precedent and that of the U.S. Supreme Court, when reviewing a motion for a directed verdict, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S. Ct. 2505, 2513, 91 L. Ed. 2d 202, 216 (1986). *See, e.g.*, *Bryant v. Nationwide Mut. Fire Ins. Co.*, 313 N.C. 362, 369, 329 S.E.2d 333, 337-38 (1985); *In re Will of Sechrest*, 140 N.C.App. 464, 468, 537 S.E.2d 511, 515 (2000); *In re Will of Allen*, 148 N.C. App. 526, 528, 559 S.E.2d 556, 558 (2002). Our Supreme Court has explained, "evidence must be considered in the light most favorable to the non-movant, giving to the non-movant the benefit of every reasonable inference that may legitimately be drawn from the evidence with contradictions, conflicts, and inconsistencies being resolved in the non-movant's favor." *Schroeder v. Oak Grove Farm Homeowners Ass'n*, 388 N.C. 208, 214, 919 S.E.2d 132, 137 (2025) (quoting *Bryant v. Nationwide Mut. Fire Ins. Co.*, 313 N.C. 362, 369, 329 S.E.2d 333, 338 (1985)).

Thus, the following facts of the case are as presented in the light most favorable to Caveators as they should have been considered by the trial court and are now considered on review. *Simmons v. Wiles*, 271 N.C. App. 665, 668, 845 S.E.2d 112, 115 (2020).

In 2010, Pamela Fields West ("Pam"), a widow and Propounder married. Pam had one daughter, Carrington, from her first marriage and had helped rear her niece, Abigail. Abigail had a daughter, Jaylie Riggins ("Jaylie"). Carrington and Jaylie were two years apart in age and grew up as sisters and best friends.

Prior to her second marriage Pam worked as a nurse at Wesley Long Hospital. She owned her home, which had been built on land apportioned from her family's farm, and co-owned other family property with her sister Paula. Pam was financially independent and managed all of her own finances. From the beginning of the relationship and throughout their marriage Pam and Propounder's financial lives remained strictly separate and independent of one another. Pam continued to pay the mortgage and all expenses related to her home and family farmland on her own because she made clear she did not intend for Propounder to receive or inherit those assets in the event of divorce or her death. Propounder "was never financially responsible [for these assets] because he was never going to actually . . . be given or receive those things." According to her family, Pam had Propounder sign a legal document to ensure he understood that he would receive no interest in her separate property upon their marriage.

Beginning in 2002, Pam engaged Terence Stanaland ("Stanaland") as her estate planning attorney. Stanaland prepared a will for Pam in 2002 and again in 2012. The 2012 will appointed Abigail as Executor and Marie and Abigail as co-trustees of the trust it created for her daughter Carrington. Under its terms, the

entirety of Pam's estate was to be placed in trust for Carrington to be paid out half upon her twenty-fifth birthday and the remainder when she attained the age of thirty. Pursuant to the "Common Disaster" provision, should Carrington die leaving no surviving children before the trust's assets had been fully distributed to Carrington, the remaining undistributed assets were to devise to Pam's heirs at law as if she had died unmarried and intestate under North Carolina law. Further, in her 2012 will, Pam stated "I make no provision in this my Will, for [Propounder], not out of any lack of love or affection but in recognition that my daughter has greater needs."

In January 2019, Pam was diagnosed with stage-four cancer and began receiving treatment. While Pam underwent treatment, Propounder, Abigail, and Carrington all worked together to care for Pam, but Abigail led the organization of her treatment and handled Pam's finances. Pam suffered significant side effects from treatment including significant weight loss, loss of appetite, nausea, fatigue, and pain.

According to family members, Pam grew progressively worse throughout the fall. By September she could no longer walk without assistance and rarely would leave her house.

On 1 September 2019, Pam was hospitalized for altered mental status after Propounder called Abigail to report that she was 'talking loopy.' On 24 September 2019, Pam presented at her doctor's office with confusion and depression and was readmitted to the hospital.

Throughout this difficult time Pam's family reported Propounder began pressuring Pam to change her 2012 will. During family meetings he complained repeatedly and reported he was not "happy with what he was getting." He commented that his first wife had left him nothing and he was "never going to have that happen to him again." Further, he told Pam that after she died, he was going to "move on" and remarry. According to family, this was upsetting to Pam, but he continued to press her about changing her will on a weekly basis. As Pam's condition declined Propounder took time off from work, allowing more opportunity for him to press Pam. He also told Pam's mother, Marie, not to come to the house or the hospital.

Family members testified that as Pam declined, she began to not recognize people, including her mother, and on at least one occasion "jerked" away from Propounder "like she was terrified" because she did not recognize him.

On an unknown day in October 2019 Pam attended a meeting with her attorney Stanaland. It is unclear what they discussed since Stanaland, and his paralegal Kimberly Thomas ("Thomas") did "not recall" a majority of the details involved. Thomas initially stated she did not see Pam at the meeting but then stated she was introduced to her in the conference room. Stanaland recalled that he had met with Pam, Carrington, and Propounder but could not recall any of the details discussed. In contrast, Propounder reported that he was merely "an Uber driver" for Pam and Carrington and did not attend the meeting. No one testified as to what was discussed at this meeting.

On 2 November 2019, after Pam struggled to wake up and once roused was very confused, Abigail decided Pam needed to be hospitalized. Thereafter, Abigail stayed with her at night while Propounder stayed with her during the day, giving him ample opportunity to pressure Pam. Her family noted she was largely non-communicative, slept most of the time, and was unable to consistently respond to questions. When she was communicative, she primarily requested pain medication. Hospital staff testified Pam was responsive when necessary and reported she remained in control of her medical decisions.

Not long after Pam's hospitalization, according to Thomas, Stanaland's office received a voicemail from Carrington telling them of her mother's condition. Thomas testified that Stanaland returned the phone call, "additional changes" were made to the will based on the phone call, and Thomas incorporated those "additional changes" into the drafted will. However, what exactly those "additional changes" were or who was on the call making additional changes was not delineated during Thomas's testimony, and Stanaland did not testify about a phone call. Abigail testified that while she was unsure of exactly what happened, she did "know that [there] was physically no way it could have been my aunt speaking [on the phone]."

On the morning of 8 November 2019, Propounder mentioned to Abigail as she was leaving the hospital that an attorney was coming to visit Pam. Concerned about Pam's ability to coherently speak to the lawyer, Abigail texted Propounder and Carrington stating, "don't let them give her pain medicines this [morning] if a lawyer

is coming." Nevertheless, hospital records indicate hospital staff administered three doses of fentanyl to Pam that morning at 7:30 a.m., 10:20 a.m., and 11:47 a.m. When Carrington arrived at Pam's room, she called Abigail at work to ask her to come back immediately because Pam was signing something. When Abigail returned, two women were with Pam and Carrington. Abigail observed one of the women prompting Pam to initial "PFW" on each page of a document packet. Pam's arm was propped on a pillow, and the papers were on her hospital tray against her chest. After the two women left Abigail asked Pam, "What did you sign?" and Pam responded, "I don't know. What did I sign?"

They learned afterwards that the document Pam had signed and executed in her hospital room on 8 November 2019 was a revised will that had been drafted by Stanaland. Jennifer L. James, an employee of Stanaland's office, and an unknown man named Mark Barger witnessed Pam sign the will. Thomas, Stanaland's paralegal, notarized Pam's signature. Although Thomas testified that Stanaland was present at some point during the will signing, Stanaland could "not recall" if he had been present and none of the other witnesses who testified about the day's events saw him in Pam's hospital room on the day of the signing.

Under the terms of the revised 2019 will, the entirety of Pam's estate was to be placed in a trust for Carrington to be distributed in thirds when Carrington reached eighteen, twenty-five, and finally twenty-eight. It also named Abigail as Executor of the estate and Trustee of the trust. Significantly, although the will

retained Pam's explicit statement, "I make no provision in this my Will, for [Propounder], not out of any lack of love or affection but in recognition that my daughter has greater needs," the "Common Disaster" provision of the will contradictorily specified that should Carrington die leaving no surviving children before the complete distribution of the trust's assets, the remaining assets were to be distributed to Propounder effectively disinheriting Pam's heirs should she have died unmarried, intestate under North Carolina law as specified in her 2012 will.

Pam remained hospitalized until her death ten days later on 18 November 2019. According to Abigail, Carrington was very upset Propounder had been named as a contingent beneficiary in the will Pam had signed ten days before her death. She believed her mother had been steadfastly opposed to him receiving any real property. Carrington and Abigail sought legal counsel from Blane Stanaland ("Blane"), Stanaland's son, also an estate attorney, to inquire whether that provision could be removed. Initially Blane told Carrington and Abigail he thought the trust could be transferred and he would handle it. He recommended they probate the 2019 will. Later, he informed them he could not transfer the trust and assets the way he expected. Probate of the 2019 will commenced. The Trust for Carrington was established according to the terms of the 2019 will but most of the assets were not distributed to her due to her age. Thereafter, Carrington's relationship with Propounder soured further until they no longer maintained contact.

On 15 January 2022, Carrington and her unborn child were killed in a car accident. Carrington was twenty years old at the time of her death. On the advice of the attorney, Abigail reached out to Propounder to inform him of Carrington's death. Propounder's contingent beneficiary interest in the undistributed remaining assets of Carrington's Trust vested upon her death.

On 16 March 2022, Pam's mother, Marie, filed a caveat to the 2019 will with the Guilford County Clerk of Court alleging duress and undue influence by Propounder and Pam's lack of competency at her signing of the 2019 will. Marie, Abigail, and Paula aligned as Caveators as Pam's surviving heirs under the terms of the 2012 will.

On 3 September 2024, the trial court heard Propounder's motion for summary judgment. The trial court granted Propounder's motion for summary judgment, finding the 2019 will was self-proving because it met the formal requirements for wills in North Carolina. Caveators do not challenge this decision.

On 4 September 2024, the remaining claims of testamentary capacity, duress, and undue influence came on for jury trial. The evidence presented by Caveators included testimony from Abigail, Marie, Jaylie, Stanaland, and Dr. Elizabeth Golding, Pam's physician. At the close of Caveators' evidence Propounder moved for a directed verdict. The trial court denied the motion stating,

> I'm going to deny the motion for directed verdict. I do recall there being some testimony from Ms. Fields Jones about [Propounder] -- counsel has characterized it as haranguing.

> I don't think that was the verb she used, but she did testify that [Propounder] did on more than one occasion express his displeasure over the terms of the 2012 will.
>
> I don't know that -- and I think given the low bar at this stage of the trial that evidence would be sufficient to move forward on undue influence and duress. She testified about what her -- in her opinion, what Ms. West or how Ms. West responded to those concerns expressed by [Propounder] or his displeasure.
>
> I don't know what other evidence might be out there, but I think for now, given the low bar that the caveators have to overcome, the motion for directed verdict is denied.

Propounder testified on his own behalf and presented testimony from Thomas, and Gail Mueller, the intensive care unit director at the hospital. Propounder renewed his motion for directed verdict at the close of all evidence. The trial court granted the motion for directed verdict on the issues of undue influence and duress. The issue of testamentary capacity proceeded to the jury. The jury found Pam had the testamentary capacity to execute the 2019 will. Caveators filed timely notice of appeal challenging the trial court's granting of a directed verdict on the issues of duress and undue influence.

## II.    Analysis

Caveators raise one issue on appeal, contending the trial court erred by granting Propounder's motion for directed verdict on the issues of undue influence and duress. We agree.

### A. Standard of Review

"Because the trial court's ruling on a motion for a directed verdict addressing the sufficiency of the evidence presents a question of law, it is reviewed *de novo*." *Maxwell v. Michael P. Doyle, Inc.*, 164 N.C. App. 319, 323, 595 S.E.2d 759, 761 (2004). On review, a motion for a directed verdict presents the question of,

> whether, upon examination of all the evidence in the light most favorable to the non-moving party, and that party being given the benefit of every reasonable inference drawn therefrom and resolving all conflicts of any evidence in favor of the non-movant, the evidence is sufficient to be submitted to the jury.

*Springs v. City of Charlotte*, 209 N.C. App. 271, 274–75, 704 S.E.2d 319, 323 (2011) (quoting *Shelton v. Steelcase, Inc.* 197 N.C. App. 404, 410, 677 S.E.2d 485, 491 (2009)). Our Supreme Court has clearly directed that when considering the motion at the close of all evidence,

> [a]fter all the evidence of plaintiff and defendant is in, the court may consider so much of defendant's evidence as is favorable to plaintiff or tends to clarify or explain evidence offered by plaintiff not inconsistent therewith, *but it must ignore that which tends to establish another and different state of facts or which tends to contradict or impeach the testimony presented by plaintiff*. Otherwise, consideration would not be in the light most favorable to plaintiff.

*Turner v. Duke Univ.*, 325 N.C. 152, 158, 381 S.E.2d 706, 710 (1989) (emphasis added) (quoting *Morgan v. Tea Co.,* 266 N.C. 221, 222–23, 145 S.E.2d 877, 879 (1966)). Based on this precedent, it is clear "[t]he party moving for a directed verdict bears a heavy burden in North Carolina." *Brookshire v. N.C. Dep't of Transp.*, 180 N.C. App. 670, 672, 637 S.E.2d 902, 904 (2006) (quoting *Edwards v. West,* 128 N.C. App. 570, 573,

495 S.E.2d 920, 923 (1998)). This burden is the same "[i]n considering any motion for directed verdict," regardless of when the party brings the motion forward, at the close of plaintiff's evidence, the close of all evidence, or even on a judgment notwithstanding the verdict. *Bryant*, 313 N.C. at 369, 329 S.E.2d at 337. A "motion for JNOV is essentially a renewal of a motion for a directed verdict . . . [t]he standard to be employed by a trial judge in determining whether to grant a judgment notwithstanding the verdict is the same standard employed in ruling on a motion for a directed verdict." *Brookshire*, 180 N.C. App. at 674, 637 S.E.2d at 905 (quoting *State Props., LLC v. Ray,* 155 N.C. App. 65, 72, 574 S.E.2d 180, 185–86 (2002)). *See also Est. of Savino v. Charlotte-Mecklenburg Hosp. Auth.*, 375 N.C. 288, 293, 847 S.E.2d 677, 681 (2020) (using the same standard at the close of all evidence); *Maxwell*, 164 N.C. App. at 322, 595 S.E.2d at 761 (using the same standard at the close of plaintiff's evidence).

After considering the evidence as instructed, our Courts have repeatedly held that a motion for directed verdict "should be denied if there is more than a scintilla of evidence supporting each element of the non-movant's claim." *Shelton,* 197 N.C. App. at 410, 677 S.E.2d at 491 (quoting *Branch v. High Rock Realty, Inc.,* 151 N.C. App. 244, 250, 565 S.E.2d 248, 252 (2002)).

The dissent contends there is "confusion and conflation" concerning this standard and posits that the applicable standard is a preponderance of the evidence. However, in 2022, our dissenting colleague held:

[t]he standard of review of directed verdict is whether the evidence, taken in the light most favorable to the non-moving party, is sufficient as a matter of law to be submitted to the jury. . . . If there is more than a scintilla of evidence supporting each element of the nonmoving party's claim, the motion for directed verdict or JNOV should be denied. A scintilla of evidence is defined as very slight evidence.

*In re Herman Earl Godwin Revocable Tr.*, 282 N.C. App. 254, 265-66, 871 S.E.2d 355, 363-64 (2022) (internal citations and quotations omitted). *See also Brennan Station 1671, LP v. Borovsky*, 262 N.C. App. 1, 7–8, 821 S.E.2d 640, 645 (2018) ("Motions for JNOV are held to high standards, and there was at least a scintilla of evidence to support Defendants' claim. . . ."); *Stamm v. Salomon*, 144 N.C. App. 672, 679, 551 S.E.2d 152, 157 (2001) ("If there is more than a scintilla of evidence supporting each element of the plaintiff's case, the directed verdict motion should be denied."); *Herring v. Food Lion, LLC*, 175 N.C. App. 22, 26, 623 S.E.2d 281, 284 (2005), *aff'd sub nom. Herring v. Food Lion, L.L.C.*, 360 N.C. 472, 628 S.E.2d 761 (2006) ("A motion for directed verdict should be denied if more than a scintilla of evidence supports each element of the non-moving party's claim.")

It is true, as the dissent notes, nearly forty years ago in 1986, the U.S. Supreme Court published a fractured opinion with multiple written dissents, which held under Rule 56 of the Federal Rules of Civil Procedure "where the factual dispute concerns actual malice . . . the appropriate summary judgment question will be whether the evidence in the record could support a reasonable jury finding either that the plaintiff

has shown actual malice by clear and convincing evidence or that the plaintiff has not." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255–56, 106 S. Ct. 2505, 2514, 91 L. Ed. 2d 202 (1986). However, "federal cases construing the Federal Rules of Civil Procedure are not binding on [our state Supreme] Court." *Slattery v. Appy City, LLC*, 385 N.C. 726, 736 n. 12, 898 S.E.2d 700, 708 n. 12 (2024). Instead "[a]s the court of last resort in this state, [our North Carolina Supreme Court] answer[s] with finality 'issues concerning the proper construction and application of North Carolina laws and the Constitution of North Carolina.'" *Hart v. State*, 368 N.C. 122, 130, 774 S.E.2d 281, 287 (2015) (quoting *State ex rel. Martin v. Preston,* 325 N.C. 438, 449, 385 S.E.2d 473, 479 (1989)). After the U.S. Supreme Court's decision in *Anderson*, individual states were able to adopt such a standard and most did. However, others like New Mexico and Texas explicitly rejected the standard for reasons very similar to those articulated in the separate dissents.

> I simply cannot square the direction that the judge "is not himself to weigh the evidence" with the direction that the judge also bear in mind the "quantum" of proof required and consider whether the evidence is of sufficient "caliber or quantity" to meet that "quantum." I would have thought that a determination of the "caliber and quantity," i.e., the importance and value, of the evidence in light of the "quantum," i.e., amount "required," could only be performed by weighing the evidence.

*Bartlett v. Mirabal*, 128 N.M. 830, 837, 999 P.2d 1062, 1069 (2000) (quoting *Anderson* at 266, 106 S. Ct. 2505 (Brennan, J., dissenting)). "Requiring the trial court to determine at the summary judgment stage whether a reasonable juror could find the

evidence to be clear and convincing suggests that the trial court must weigh the evidence." *Huckabee v. Time Warner Ent*. Co. L.P., 19 S.W.3d 413, 421–22 (Tex. 2000).

Our dissenting colleague does not cite, nor does a review of North Carolina judicial history reveal, the explicit general adoption of such a standard in our state. Instead, our colleague relies on *Scarborough v. Dillard's, Inc.*, an inapposite and clearly distinguishable case from our Supreme Court which references *Anderson. Scarborough v. Dillard's, Inc.*, 363 N.C. 715, 693 S.E.2d 640 (2009). In *Scarborough* our Supreme Court considered how a directed verdict standard should be reviewed when the statute at issue specifically and distinctly required a claimant to "prove the existence of an aggravating factor by clear and convincing evidence." *Id.* at 720, 693 S.E.2d at 643 ( quoting N.C. Gen. Stat. § 1D–15(b) (2007)). The Court held,

> in reviewing a trial court's ruling on a motion for judgment notwithstanding the verdict *on punitive damages*, our appellate courts must determine whether the nonmovant produced clear and convincing evidence from which a jury could reasonably find one or more of the statutory aggravating factors required by N.C. [Gen. Stat.] § 1D–15(a) and that that aggravating factor was related to the injury for which compensatory damages were awarded.

*Id.* at 721-22, 693 S.E.2d at 644 (emphasis added) This holding comports with the "*statutory burden* of clear and convincing evidence" explicitly set forth by our legislature. *Id.* at 722, 693 S.E.2d at 644 (emphasis added). This decision was clearly narrowly applied to the statute at issue and the Supreme Court continued post-

- 15 -

*Scarborough* to rely on the "more than a scintilla" standard rather than generalizing the high bar of clear and convincing evidence to all directed verdict cases as evidenced by their holding in *Stark*.

> So long as some view of the facts reasonably established by the evidence would support a jury's decision in favor of [Defendant], the trial court properly denied plaintiffs' motion. In other words, if there is more than a scintilla of evidence supporting this affirmative defense, the trial court's decision should be affirmed.

*Stark ex rel. Jacobsen v. Ford Motor Co.*, 365 N.C. 468, 480, 723 S.E.2d 753, 761 (2012) (internal citations omitted).

Our dissenting colleague also takes issue with our Supreme Court's interchangeable use of the terms "sufficient as a matter of law" and "more than scintilla of evidence" when discussing the directed verdict standard. *See, e.g., Stark ex rel. Jacobsen v. Ford Motor Co.*, 365 N.C. 468, 480, 723 S.E.2d 753, 761 (2012) ("more than a scintilla of evidence"); *but see, e.g. Desmond v. News & Observer Publ'g Co.*, 375 N.C. 21, 41, 846 S.E.2d 647, 660 (2020) ("sufficient as a matter of law to be submitted to the jury"). He concludes, without citing to North Carolina caselaw, that "sufficient as a matter of law" must be a preponderance of the evidence and therefore presumes our Supreme Court "flip-flops" between these two burdens. We disagree.

Our Supreme Court has clearly stated, whether a claim is "sufficient as a matter of law" to go to the jury depends on "[i]f 'there is evidence to support each element of the nonmoving party's cause of action, [if so] then the motion for directed

verdict and any subsequent motion for [JNOV] should be denied." *Green v. Freeman*, 367 N.C. 136, 140–41, 749 S.E.2d 262, 267 (2013) (quoting *Abels v. Renfro Corp.*, 335 N.C. 209, 215, 436 S.E.2d 822, 825 (1993). What level of evidence is sufficient to support each element has also been considered by our highest court,

> In *State v. Johnson*, 199 N.C. 429, 154 S.E. 730 (1930), Chief Justice Stacy wrote the classic statement of the sufficiency of the evidence test:
>
> "It is sometimes difficult to distinguish between evidence sufficient to carry a case to the jury, and a mere scintilla, which only raises a suspicion or possibility of the fact in issue. (Citations omitted.) The general rule is that, if there be any evidence tending to prove the fact in issue, or which reasonably conduces to its conclusion as a fairly logical and legitimate deduction, and not merely such as raises a suspicion or conjecture in regard to it, the case should be submitted to the jury."

*State v. Earnhardt*, 307 N.C. 62, 66, 296 S.E.2d 649, 652 (1982) (quoting *State v. Johnson*, 199 N.C. 429, 431, 154 S.E. 730, 731 (1930)). The Court went on to explicitly state, "[t]he terms 'more than a scintilla of evidence' and 'substantial evidence' are in reality the same and simply mean that the evidence must be existing and real, not just seeming or imaginary." *State v. Earnhardt*, 307 N.C. 62, 66, 296 S.E.2d 649, 652 (1982).

This is consistent with our Supreme Court's most recent decision on the burden of evidence to survive a directed verdict in North Carolina. "[T]o survive a motion for JNOV, the nonmovant need only point to 'more than a scintilla of evidence' that supports its claim—that is, anything 'more than raw suspicion, conjecture, guess,

surmise, or speculation.'" *Schroeder*, 388 N.C. at 214, 919 S.E.2d at 137 (quoting *Vanguard Pai Lung, LLC v. Moody*, 387 N.C. 376, 379-80, 912 S.E.2d 788, 792 (2025)).

Therefore, a claim is "sufficient as a matter of law" to survive a directed verdict when there is substantial evidence or "more than a scintilla of evidence" to support each element of the nonmoving party's cause of action. Our Supreme Court has not conflated two separate standards.

Although the Federal Rules of Civil Procedure may be "pertinent for guidance and enlightenment," our North Carolina Supreme Court creates binding precedent in our state, and it is our "responsibility to follow those decisions, until otherwise ordered by the Supreme Court." *Cannon v. Miller*, 313 N.C. 324, 324, 327 S.E.2d 888, 888 (1985). Our Supreme Court has clearly held only "more than a scintilla of evidence" is necessary to defeat a motion for directed verdict; therefore, we respectfully disagree with our dissenting colleague's contention that a preponderance of the evidence standard for directed verdict is the controlling precedent.

Further, our Supreme Court has held "where the question of granting a directed verdict is a close one, . . . the better practice is for the trial court to reserve its decision on the motion and allow the case to be submitted to the jury." *Turner*, 325 N.C. at 158, 381 S.E.2d at 710.

Caveators contend, taken in the light most favorable to them, more than a scintilla of evidence to support both issues was presented. Therefore, the trial court should have allowed the issues of undue influence and duress to reach the jury. We

agree.

## B. Undue Influence

> In the context of a will caveat, undue influence is more than mere persuasion, because a person may be influenced to do an act which is nevertheless his voluntary action. The influence necessary to nullify a testamentary instrument is the fraudulent influence over the mind and will of another to the extent that the professed action is not freely done but is in truth the act of the one who procures the result.

*In re Est. of Whitaker*, 144 N.C. App. 295, 300, 547 S.E.2d 853, 857–58 (2001) (cleaned up).

Our Supreme Court has delineated seven factors relevant to the consideration of undue influence:

> 1. Old age and physical and mental weakness.
> 2. That the person signing the paper is in the home of the beneficiary and subject to his constant association and supervision.
> 3. That others have little or no opportunity to see him.
> 4. That the will is different from and revokes a prior will.
> 5. That it is made in favor of one with whom there are no ties of blood.
> 6. That it disinherits the natural objects of his bounty.
> 7. That the beneficiary has procured its execution.

*In re Will of Andrews*, 299 N.C. 52, 55, 261 S.E.2d 198, 200 (1980) (quoting *In re Will of Mueller*, 170 N.C. 28, 30, 86 S.E. 719, 720 (1915). However, "a caveator need not demonstrate every factor named in *Andrews* to prove undue influence, as undue influence is generally proved by a number of facts, each one of which standing alone may be of little weight, but taken collectively may satisfy a rational mind of its

existence." *In re Will of Jones,* 362 N.C. 569, 576, 669 S.E.2d 572, 578 (2008) (cleaned up). Additionally, the *Andrews* factors are not exclusive, other factors may be considered as well, including whether the changes to the will run "contrary" to the testators "long-expressed desires" and whether the testator's lack of trust in the Propounder can be demonstrated. *See In re Will of Jones,* 362 N.C. at 580, 669 S.E.2d at 580; *see also In re Est. of Phillips*, 251 N.C. App. 99, 112, 795 S.E.2d 273, 283 (2016).

We conclude the Caveators presented at least some evidence of most, if not all, of the *Andrews* factors as well as the additional considerations delineated in *Jones*.

The Caveators demonstrated the first factor, physical and mental weakness, by presenting ample evidence of Pam's terminal cancer diagnosis resulting in loss of appetite, nausea, weight loss of more than one hundred pounds, fatigue, uncontrolled pain despite high dosage pain medication, and the inability to move her body without assistance. Family members testified they observed her struggle with her memory, difficulty recognizing people, and decreased ability to communicate.

The Caveators demonstrated the second factor, the person signing the paper is in the home of the beneficiary and subject to his constant association and supervision, by presenting evidence that Pam resided in the same home with Propounder when not hospitalized and that she was under his constant association and watchful eye when hospitalized since he stayed with her during the day after leaving his job to be with her.

Relating to the third factor, opportunity to see the testator, the trial court received ample evidence that family members routinely visited Pam. However, Propounder's own testimony acknowledged he had told Pam's mother to stay away from their home and the hospital.

Caveators demonstrated the fourth factor, differences in the wills, by introducing each. The 2019 will clearly revoked the 2012 will and changed the devise from explicitly stating no provision is made for Propounder to Propounder being added as the contingent beneficiary for Pam's entire estate.

Caveators demonstrated the fifth and sixth factors, blood ties and objects of the bounty, by the change in beneficiaries in the 2019 will from her blood relatives to her spouse, a non-blood relative, notwithstanding a spouse is a natural object of bounty. Our Supreme Court has held the relationship between spouses can "lesson[] the importance of these factors [five and six]" when there is evidence that the changes in the will ran contrary to long-expressed desires of the testator as here. *In re Will of Jones*, 362 N.C. at 580, 669 S.E.2d at 580. The 2012 will explicitly disinherited Propounder, and Pam's family members testified to her long-standing explicit desire to keep the family property in the family. In contrast, the terms of the 2019 will resulted in Pam's real property, some of which was co-owned with blood relatives, to pass outside of the family, contrary to her long-expressed desires.

Caveators demonstrated the seventh factor, procurement of the execution, by offering testimonial evidence concerning Propounder's aggressive complaints to Pam

about the terms of her 2012 will. At the very least Propounder testified that he drove Pam to her initial appointment with her attorney, which Stanaland testified Propounder attended. Propounder also informed Pam's family members that an attorney was coming to the hospital to see her. Abigail testified that she did not know who contacted the attorney but it was not possible for Pam to have called the attorney's office herself stating, "I'm not sure what my exact determination of what happened [is], but I do know that [there] was physically no way it could have been my aunt speaking [on the phone]."

Finally, regarding other considerations, family members testified Pam had always kept her finances separate from Propounder, explicitly communicated her intention for her real property to stay with her family, and did not trust Propounder to pay the bills, handle the execution of her will, or administer the Trust for her daughter.

Recently, in *Jones v. Corn,* this Court held that when giving the "benefit of every reasonable inference that may legitimately be drawn from the evidence" to the non-moving party, three positive *Andrews* factors constituted more than a scintilla of evidence to require the issue of undue influence to go to the jury. *Jones v. Corn*, 293 N.C. App. 596, 607, 902 S.E.2d 17, 26 (2024) (quoting *Bryant,* 313 N.C. at 369, 329 S.E.2d at 338). Those factors included (1) testators were mentally weak, (2) the new deeds favored one party over the other, and (3) the party accompanied the testators to the meeting with the attorney. Moreover, in the case *sub judice*, Caveators

provided at least some evidence of all the numerous factors laid out by our Courts in *Jones*, *Andrews*, and *Phillips*. *In re Will of Jones,* 362 N.C. at 575-76, 669 S.E.2d at 577-78; *In re Will of Andrews*, 299 N.C. at 55, 261 S.E.2d at 200; *In re Est. of Phillips*, 251 N.C. App. at 111-2, 795 S.E.2d at 282-83. We conclude Caveator's evidence clearly meets its burden of more than a scintilla of evidence to reach the jury and constitutes "more than raw suspicion, conjecture, guess, surmise, or speculation." *Schroeder*, 388 N.C. at 214, 919 S.E.2d at 137.

Our dissenting colleague contends the trial court "held the evidence fails to show Propounder's purported expressed disagreement with Pam's estate plan in the weeks before her death rose to the level of showing undue influence or duress." This statement is an oversimplification of the trial court's determination. The trial court initially held the evidence presented was sufficient for undue influence, duress, and capacity but then inexplicably reweighed the evidence at the close of all evidence and found differently on undue influence and duress.

After Caveators' presentation of evidence, the trial court noted that based on "the low bar" of a directed verdict the Caveators' "evidence would be sufficient to move forward on undue influence and duress." Inexplicably, at the close of all evidence the trial court weighed both the Caveator's and Propounder's evidence, as opposed to taking every inference in favor of the Caveators as required and granted the motion for directed verdict. The trial court eventually concluded

If I let this go to the jury on the issue of undue influence,

> then I am saying that the expressions of displeasure made
> during these open conversations with other people in the
> home are tantamount to that definition of undue influence
> and that a reasonable jury could so find from that
> testimony. And I just don't believe that's the case.

We hold the trial court erred in granting a directed verdict. The "expressions of displeasure" were only one piece of evidence, not the entirety of a complex and highly fact specific case. Additionally, the trial court had already considered those "expressions of displeasure" as well as the rest of the evidence and testimony at the close of plaintiff's evidence and found them sufficient to go to the jury. Our Supreme Court has stated, "where a trial court denies a motion for directed verdict made at the close of plaintiff's evidence, it is error for the trial court to then enter judgment in favor of defendant notwithstanding the verdict." *Godfrey v. Res-Care, Inc.*, 165 N.C. App. 68, 84, 598 S.E.2d 396, 407 (2004). This is because the trial judge has already determined in its directed verdict analysis that the claims meet the standard to go to the jury. Employing the same analysis a second time and finding a different result is error.

This case presents similar facts. After undertaking the directed verdict analysis at the close of Caveator's evidence the trial judge found there was more than a scintilla of evidence to support each element of the nonmoving party's cause of action and denied the motion. Propounder did not present any affirmative defenses but only rebutted evidence with his own witnesses. The trial court could not then, if utilizing the correct standard find that Caveators no longer presented more than a

scintilla of evidence to support each element of their claim. To be clear, the correct standard is "any of defendant's evidence which tends to contradict or refute plaintiff's evidence is not to be considered, but the plaintiff is entitled to the benefit of defendant's evidence which is favorable to plaintiff." *Koonce v. May*, 59 N.C. App. 633, 634, 298 S.E.2d 69, 71 (1982).

Our dissenting colleague appears to consider evidence presented by Propounder in the light most favorable to Propounder. He notes: the scenario to permit Propounder to inherit was "unlikely," for over two years the will was administered without objection, Marie's testimony as the initial Caveator was unclear as to the reason for the challenge, and Jaylie, the executor's daughter, was living rent-free in Pam's house at the time of the trial. At best these facts are irrelevant to the determination of undue influence and duress, but more significantly their inclusion reflects a reweighing of the evidence in a light more favorable to the Propounder in direct contradiction to binding caselaw. Our dissenting colleague also contends it is uncontroverted that Pam met with Stanaland alone and that Carrington contacted Stanaland's office so that the revised will could be executed. As noted *supra,* the testimony was far from uncontroverted. In fact, Stanaland, Thomas, and Propounder differed in their recollection of the facts and frequently stated they could "not recall" relevant details.

The question of whether to grant a directed verdict may have been a close one; notwithstanding, our Supreme Court precedent is crystal clear: when the

determination of directed verdict is a close call "the better practice is for the trial court to reserve its decision on the motion and allow the case to be submitted to the jury." *Turner*, 325 N.C. at 158, 381 S.E.2d at 710. Similarly, this Court's precedent clearly holds even when an outcome seems "slim," it is the jury's role to weigh the evidence. *Jones v. Corn*, 293 N.C. App. at 605, 902 S.E.2d at 25. Taken in the light most favorable to the Caveators, the evidence meets the standard of "more than a scintilla of evidence" necessary to go to the jury. Therefore, the trial court erred in granting a directed verdict on the issue of undue influence. We reverse the order and remand for a new trial on this issue.

**C. Duress**

It is well settled that undue influence and duress are "related wrongs, and to some degrees overlap." *In re Est. of Phillips*, 251 N.C. App. at 112, 795 S.E.2d at 283 (quoting *Link v. Link*, 278 N.C. 181, 191, 179 S.E.2d 697, 703 (1971)). This Court has acknowledged that "[a] caveator's allegations underlying her claims of undue influence and duress may be the same." *In re Est. of Phillips*, 251 N.C. App. at 112, 795 S.E.2d at 283.

Our Court has explained,

> duress exists when someone, by the unlawful or wrongful act of another, is induced to make a contract or perform or forego some act under circumstances which deprive him of the exercise of free will, and an act is wrongful if made with the corrupt intent to coerce a transaction grossly unfair to the victim and not related to the subject of such proceedings.

*Denis v. Chandler*, 920 S.E.2d 199, 217 (N.C. Ct. App. 2025) (cleaned up).  This Court considers the following factors when determining whether a victim's will was actually overcome:

> the age, physical and mental condition of the victim, whether the victim had independent advice, whether the transaction was fair, whether there was independent consideration for the transaction, the relationship of the victim and alleged perpetrator, the value of the item transferred compared with the total wealth of the victim, whether the perpetrator actively sought the transfer and whether the victim was in distress or an emergency situation.

*Stegall v. Stegall*, 100 N.C. App. 398, 401–02, 397 S.E.2d 306, 308 (1990) (quoting *Curl v. Key*, 64 N.C. App. 139, 142, 306 S.E.2d 818, 820 (1983) *reversed on other grounds,* 311 N.C. 259, 316 S.E.2d 272 (1984)).

Viewing the evidence in the light most favorable to the Caveators, the evidence tended to show (1) Pam was on her death bed with limited physical and mental strength; (2) no one from the family or hospital saw her lawyer present at the signing of the will and he testified he had no memory of the event; (3) prior to her terminal illness she had consistently communicated to her family members and had memorialized in her 2012 will her long-standing desire and explicit intention to keep her real property in the family; (4) she had made provision for Propounder as beneficiary of her life insurance; (5) Propounder had informed his dying wife that he was planning to move on and remarry after she died; (6) Propounder pressed her

repeatedly about his anger and frustration at not being named in her will; and (7) Propounder was now the contingent beneficiary of her entire estate under the 2019 will after being deliberately excluded under the 2012 will. Based on the facts of this case, we conclude there is more than a scintilla of evidence to support Caveators' argument that Propounder wrongly coerced a weak, hospitalized dying woman to modify her estate mere days prior to her death in a manner contrary to her long-standing desires and consistently stated intent.

We acknowledge there may be alternative interpretations of the facts presented. However, as our Supreme Court held in *Turner,* we conclude "the better practice is for the trial court to reserve its decision on the motion and allow the case to be submitted to the jury." *Turner*, 325 N.C. at 158, 381 S.E.2d at 710. Taken in the light most favorable to the Caveators, the evidence meets the standard of "more than a scintilla of evidence" necessary to go to the jury. Therefore, the trial court erred in granting a directed verdict on the issue of duress. We reverse the order and remand for a new trial on this issue.

## III. Conclusion

We hold the trial court erred in granting a directed verdict on the issues of undue influence and duress, thus removing those issues from the purview of the jury, because the issues presented in this case are highly fact intensive and there was at least some evidence, when viewed in the light most favorable to the non-moving party, of all the relevant factors set forth by our Courts. We reverse the trial court order and

remand for a new trial on the issues of undue influence and duress.

REVERSED AND REMANDED.

Judge FREEMAN concurs.

Judge TYSON dissents by separate opinion.

TYSON, Judge, dissenting.

The majority's opinion relies upon the erroneous standard of proof and employs an improper appellate review to hold the trial court erred by granting Propounder's motion for a directed verdict on the claims of undue influence and duress at the close of all evidence. I vote to affirm the trial court's judgment and respectfully dissent.

## IV.  Background

The majority's opinion does not provide a full factual scenario of the evidence admitted. First, the addition of Propounder as a contingent beneficiary was not the only change Pam made to her will in 2019. The 2019 will also lowered the age her daughter, Carrington, was required to attain before receiving her inheritance. It permitted the trust established for Carrington to distribute one-third of the assets to her at ages eighteen and twenty-five, and the remainder in full at age twenty-eight. The 2012 will required Carrington to have attained the age of twenty-five before she would receive any of the trust assets. By 2019 Pam knew her health was precarious and Carrington would need funds earlier to live.

Further, under the 2019 will, Propounder stood to inherit from Pam's estate **only** in the event Carrington predeceased him, and also **only** before she reached the age of twenty-eight, when all trust assets would have been distributed to her. Nothing in the record indicates Carrington suffered from a condition, which could lead to her early demise. The only scenario for Propounder to inherit from Pam's

estate was unlikely to occur. Carrington's death was purely accidental and occurred more than two years after the will was probated, the estate was established, and the trust was funded and partially disbursed.

Both wills named Abigail, Pam's niece, as executor. The 2019 will named Abigail as trustee of Carrington's trust and as the second contingent beneficiary behind Propounder. On or around 4 December 2019, Abigail, as executor and fiduciary, presented and tendered the 2019 will to the Clerk of Superior Court of Guilford County for admission to probate. Abigail qualified under the 2019 will and was issued letters as Executrix of Pam's estate.

For over two years, Abigail administered Pam's estate and Carrington's trust under the authority given to her by letters testamentary issued pursuant to the 2019 will. Marie, Pam's mother, filed the caveat proceeding. Marie was asked about her objections to the 2019 will. She testified, "I've just heard bits and pieces, but I really don't know anything about it that much." She further testified, "I believe [Propounder] was wanting . . . her to change things so he would be over it all, and I didn't like that." Marie "didn't want him to be the head of it" and "decide what he wanted and all." Marie testified she believed these things because she "had heard someone say that."

Abigail aligned with Marie as a caveator to impeach and to set aside the will under which she had tendered and been appointed as a fiduciary. This appeal presents a caveat to an undisputed self-proving will executed with testamentary

2

capacity. Marie, one Caveator, does not know the reason for the challenge and Abigail, the other, advocated for and upheld the will, until a unforeseen contingency created a distribution she disagreed with. Paula Fields, Pam's sister, is also designated as a caveator, but no evidence or testimony was elicited regarding Paula's objections.

In early September of 2019, two months before Pam died, it became apparent she was having difficulty paying her bills and handling her personal affairs. The family gathered to discuss how these matters would be handled moving forward. Abigail testified Propounder was "complaining" about the lack of provision Pam had made for him in the 2012 will. He "was harping" he should inherit more of Pam's cash assets, since Carrington would receive the house and farmland. Abigail testified it was an "extremely stressful" conversation. She testified Propounder stated he was going to remarry because he "couldn't be alone," and Pam did not have a problem with that. Abigail asserted Pam was "obviously upset" during this conversation.

After this initial conversation, Abigail testified Propounder raised the topic of Pam's estate and his inheritance on a weekly basis "for quite a while." These discussions were in Pam's presence and Pam told Abigail she "wanted him to stop." Abigail's daughter, Jaylie Riggins, testified she "many times" saw Propounder "walk off mad or upset" and he stated, "this isn't right and that . . . Carrington was too young to be getting everything and that he wasn't going to be left with nothing again." Jaylie, the executor's daughter, was living rent-free in Pam's house at the time of

trial. Propounder's marriage to Pam had continued for over seven additional years between the execution of the 2012 and the 2019 wills, and Carrington was attaining the age of majority. Carrington was twenty years old and expecting a child when she died.

Uncontroverted testimony established Propounder drove Pam to meet with her established attorney, Mr. Stanaland, in October of 2019 upon Pam's request. Pam met with Mr. Stanaland alone. Mr. Stanaland testified the meeting with Pam "was as routine as any engagement I would ever have." Pam's treating physician, Dr. Golding, testified "Pam's affairs were very strong on her mind" while she was in the hospital. Most notably, it was Carrington who contacted Mr. Stanaland's office after her mother had been hospitalized so that the revised will could be prepared and executed.

## V. Standard of Proof

The standard of review and burden of proof for a motion for a directed verdict at the close of all evidence in the majority's opinion is erroneous. It cites the "more than a scintilla rule," and asserts a motion for directed verdict "'should be denied if there is more than a scintilla of evidence supporting each element of the non-movant's claim.'" *Shelton v. Steelcase, Inc.,* 197 N.C. App. 404, 410, 677 S.E.2d 485, 491 (2009) (quoting *Branch v. High Rock Realty, Inc.,* 151 N.C. App. 244, 250, 565 S.E.2d 248, 252 (2002), *disc. review denied*, 356 N.C. 667, 576 S.E.2d 220 (2003)). The majority's opinion holds the trial court erred by granting directed verdict in favor of Propounder,

4

because Caveators had presented "more than a scintilla of evidence" to support the claims for undue influence and duress at the close of all evidence. *Id.*

Confusion and conflation exists among our many precedents on this issue. Some precedents hold a case is sufficient to be submitted to the jury where there is "more than a scintilla of evidence" to support each element of the claim. *See, e.g., Schroeder v. Oak Grove Farm Homeowners Ass'n*, 388 N.C. 208, 215, 919 S.E.2d 132, 138 (2025); *Morris v. Scenera Research, LLC*, 368 N.C. 857, 861, 788 S.E.2d 154, 157 (2016); *Stark v. Ford Motor Co.*, 365 N.C. 468, 480, 723 S.E.2d 753, 761 (2012).

Multiple Supreme Court precedents hold the proper standard is to determine whether evidence on a motion for directed verdict *at the close of all evidence*, when taken in the light most favorable to the non-moving party, is "sufficient as a matter of law to be submitted to the jury." *See, e.g., Estate of Savino v. Charlotte-Mecklenburg Hosp. Auth.*, 375 N.C. 288, 293, 847 S.E.2d 677, 681 (2020); *Desmond v. News & Observer Publ'g Co.*, 375 N.C. 21, 41, 846 S.E.2d 647, 660-61 (2020); *Green v. Freeman*, 367 N.C. 136, 140, 749 S.E.2d 262, 267 (2013); *Davis v. Dennis Lilly Co.*, 330 N.C. 314, 322-23, 411 S.E.2d 133, 138 (1991).

Our jurisprudence appears to "flip-flop" between the two burdens and standards of review, and they are not the same. A "scintilla" has been defined as "very slight evidence." *Morris*, 368 N.C. at 861, 788 S.E.2d at 158 (citation omitted), whereas, "[i]n ordinary civil actions, the verdict should be based on the preponderance of the evidence." *Wyatt v. Queen City Coach Co.*, 229 N.C. 340, 342, 49 S.E.2d 650,

5

652 (1948) (citations omitted). "By a preponderance of the evidence is meant simply the evidence which is of greater weight than that offered in opposition to it." *Id.* (citations omitted). As our Supreme Court has explained, it logically follows that evidence "sufficient as a matter of law" to be submitted to the jury would be evidence that *could* support a jury's determination that the party who carries the burden of proof prevails by the applicable standard of review. *See Scarborough v. Dillard's, Inc.*, 363 N.C. 715, 721, 693 S.E.2d 640, 643-44 (2009) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 91 L. Ed. 2d 202, 216 (1986)).

## A. *Anderson v. Liberty Lobby, Inc.*

The Supreme Court of the United States has explained the difference in these concepts:

> [W]e are convinced that the inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits. If the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks *whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict* – whether there is evidence upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is

imposed.

*Anderson*, 477 U.S. at 252, 91 L. Ed. 2d at 213 (citation omitted) (emphasis supplied).

The majority's opinion asserts this issue has been settled by our Supreme Court and cites its recent opinion in *Schroeder*, 388 N.C. at 214, 919 S.E.2d at 137. While I agree our Supreme Court "answer[s] with finality issues concerning the proper construction and application" of our State's laws and Constitution and we are bound by its precedents, I do not agree this issue has been settled "with finality." *Hart v. State*, 368 N.C. 122, 130, 774 S.E.2d 281, 287 (2015) (quotation omitted). In fact, it is just the opposite.

### B. *Davis v. Dennis Lilly Co.*

A survey of cases which have addressed directed verdicts over the years demonstrates this point. Our Supreme Court's 1991 decision in *Davis*, 330 N.C. at 314, 411 S.E.2d at 133 is most often cited as precedent for the standard of review. In that case our Supreme Court agreed with the Supreme Court of the United States in *Anderson* and stated:

> The standard of review of directed verdict is whether the evidence, taken in the light most favorable to the non-moving party, is sufficient as a matter of law to be submitted to the jury. *Kelly v. International Harvester Co.*, 278 N.C. 153, 179 S.E.2d 396 (1971). When determining the correctness of the denial for directed verdict or judgment notwithstanding the verdict, *the question is whether there is sufficient evidence to sustain a jury verdict in the non-moving party's favor*, *Smith v. Voncannon*, 283 N.C. 656, 197 S.E.2d 524 (1973), or to present a question for the jury. *In re Housing Authority*, 235 N.C. 463, 70

7

S.E.2d 500 (1952).

*Davis*, 330 N.C. at 322-23, 411 S.E.2d at 138 (emphasis supplied).

Our Supreme Court thereafter has consistently cited *Davis* as the controlling standard. *See Best v. Duke Univ.*, 337 N.C. 742, 749, 448 S.E.2d 506, 510 (1994) ("To survive a motion for a directed verdict, the nonmoving party . . . must present 'sufficient evidence to sustain a jury verdict in [his] favor, . . . or to present a question for the jury.'" (quoting *Davis*, 330 N.C. at 323, 411 S.E.2d at 138)); *Gray v. N.C. Ins. Underwriting Ass'n*, 352 N.C. 61, 73, 529 S.E.2d 676, 684 (2000) ("[W]e conclude that the evidence at trial, when taken in a light most favorable to plaintiffs, was sufficient to sustain a jury verdict in plaintiffs' favor on this issue.") (citing *Davis*, 330 N.C. at 323, 411 S.E.2d at 138)).

Some cases decided after *Davis* cite other, older cases for the same standard. For example, in *Stanfield v. Tilghman*, 342 N.C. 389, 394, 464 S.E.2d 294, 297 (1995), the Court explained:

> This Court has stated many times that "[a] motion for directed verdict under Rule 50 of the North Carolina Rules of Civil Procedure tests the legal sufficiency of the evidence, considered in the light most favorable to the nonmovant, to take the case to the jury." *Northern Nat'l Life Ins. v. Miller Machine Co.*, 311 N.C. 62, 69, 316 S.E.2d 256, 261 (1984). Only when the evidence is insufficient to support a verdict in the nonmovant's favor should a motion for a directed verdict be granted. *Snow v. Power Co.*, 297 N.C. 591, 256 S.E.2d 227 (1979).

*See also Braswell v. Braswell*, 330 N.C. 363, 367, 410 S.E.2d 897, 899 (1991), *reh'g*

*denied,* 330 N.C. 854, 413 S.E.2d 550 (1992) ("The question presented on appeal is whether the evidence, taken in the light most favorable to plaintiff, was sufficient to take the case to the jury." (citing *Hitchcock v. Cullerton*, 82 N.C. App. 296, 297, 346 S.E.2d 215, 217 (1986)); *Buford v. Gen. Motors Corp.*, 339 N.C. 396, 404-05, 451 S.E.2d 293, 297 (1994) ("A directed verdict is improper if the evidence, viewed in a light most favorable to the non-moving party, is legally sufficient to send the issue to the jury." (citing *Taylor v. Walker,* 320 N.C. 729, 733-34, 360 S.E.2d 796, 799 (1987)); *Bryant v. Nationwide Mut. Fire Ins. Co.,* 313 N.C. 362, 369, 329 S.E.2d 333, 337-38 (1985); *Dockery v. Hocutt*, 357 N.C. 210, 217, 581 S.E.2d 431, 436 (2003) ("It is only when the evidence is insufficient to support a verdict in the non-movant's favor that the motion should be granted.").

## C. *Scarborough v. Dillard's, Inc.*

The Supreme Court's 2009 decision in *Scarborough* specifically analyzed the two standards of review to determine which was the correct one. The plaintiff had brought a malicious prosecution suit against the defendant. *Scarborough,* 363 N.C. at 719, 693 S.E.2d at 642. The trial court granted JNOV in favor of the defendant on the issue of punitive damages, which set aside the jury's award. *Id.* A divided panel of this Court reversed the trial court's order granting JNOV. Our Supreme Court explained:

> [T]he Court of Appeals reversed the trial court's entry of judgment notwithstanding the verdict as to punitive damages. The Court of Appeals' majority reviewed the

9

> issue under the "more than a scintilla of evidence" standard. *Scarborough v. Dillard's Inc.*, 188 N.C. App. 430, 431, 655 S.E.2d 875, 876 (2008). The dissenting judge would have affirmed the trial court as plaintiff failed to present "clear and convincing evidence" of any statutory aggravating factor required for punitive damages. *Id.* at 438, 655 S.E.2d at 881 (Hunter, Robert C., J., dissenting).

*Id.*

The defendant argued this Court had used "an incorrect [scintilla of evidence] standard of review and that the evidence was insufficient to support a jury's finding of an aggravating factor." *Id.* at 719, 693 S.E.2d at 642-43. The Supreme Court agreed. *Id.* at 719, 693 S.E.2d at 643.

The Court cited its previous decision in *Davis* as the correct standard of review and stated: "A directed verdict and judgment notwithstanding the verdict are therefore not properly allowed unless it appears, as a matter of law, that a recovery cannot be had by the plaintiff upon any view of the facts which the evidence reasonably tends to establish." *Id.* at 720, 693 S.E.2d at 643 (citing *Manganello v. Permastone, Inc.*, 291 N.C. 666, 670, 231 S.E.2d 678, 680 (1977)) (internal quotation marks omitted). The Court explained a plaintiff must prove the existence of one or more aggravating factors to recover punitive damages, and proof must be made by clear and convincing evidence under the statute. *Id.* (citing N.C. Gen. Stat. § 1D-15(b) (2007)).

The plaintiff argued "whether the evidence is clear and convincing is for the jury to decide; and if there is more than a scintilla of evidence from which the jury

10

could infer the existence of the aggravating factor, the determination should be left to the jury." *Id.* at 721, 693 S.E.2d at 643. The Supreme Court *specifically* rejected this argument and cited the Supreme Court of the United States's decision in *Anderson:*

> [T]he General Assembly intended that the quantum of evidence be more than would be sufficient to uphold liability for the underlying tort and that the trial court have a role in ascertaining whether the evidence presented was sufficient to support a jury's finding of the factor under the standard established by the legislature.

*Id.* at 721, 693 S.E.2d at 644 (citing *Anderson,* 477 U.S. at 255, 91 L. Ed. 2d at 216).

> Our Supreme Court held:

> Reviewing the trial court's ruling under the 'more than a scintilla of evidence' standard does not give proper deference to the statutory mandate that the aggravating factor be proved by clear and convincing evidence. *Evidence that is only more than a scintilla cannot as a matter of law satisfy the nonmoving party's threshold statutory burden of clear and convincing evidence.*

*Id.* at 722, 693 S.E.2d at 644 (emphasis supplied).

## D. Precedents Following *Davis* and *Scarborough*

It would appear the Supreme Court settled this issue in *Scarborough. See id.* However, in 2016, the Court issued its opinion in *Morris,* 368 N.C. at 857, 788 S.E.2d at 154. In that case, the Court stated, "To survive a motion for directed verdict or JNOV, the non-movant must present 'more than a scintilla of evidence' to support its claim." *Id.* at 861, 788 S.E.2d at 157 (quoting *Stark,* 365 N.C. at 480, 723 S.E.2d at

11

761). *Stark,* the case the Court relied upon for the scintilla standard, was decided after the *Scarborough* case.

The issue becomes more complicated with subsequent cases, in which the Supreme Court cites *Davis* for the standard of review. *See Desmond v. News & Observer Publ'g Co.*, 375 N.C. 21, 41, 846 S.E.2d 647, 660 (2020) ("The standard of review for the denial of a directed verdict or JNOV is the same and inquires whether the evidence, taken in the light most favorable to the non-moving party, is sufficient as a matter of law to be submitted to the jury." (quotation marks omitted)); *Estate of Savino* 375 N.C. 293, 847 S.E.2d at 681 ("Accordingly, we must determine whether the evidence, taken in the light most favorable to the non-moving party, is sufficient as a matter of law to be submitted to the jury." (quotation marks omitted)); *Chisum v. Campagna*, 376 N.C. 680, 699, 855 S.E.2d 173, 186 (2021) ("The issue before a reviewing court in determining whether a motion for a directed verdict or judgment notwithstanding the verdict should have been allowed or denied focuses upon whether the evidence, taken in the light most favorable to the non-moving party, is sufficient as a matter of law to be submitted to the jury." (quotation marks omitted)); *Keith v. Health-Pro Home Care Servs., Inc.*, 381 N.C. 442, 455, 873 S.E.2d 567, 577 (2022) ("On appeal, the standard of review for both motions is the same: whether the evidence, taken in the light most favorable to the non-moving party, is sufficient as a matter of law to be submitted to the jury." (quotation marks omitted)).

While all of these cases employ *Davis*'s holding as the standard of review, for

some reason, and without discussion, the Court reverts to the *Morris* standard in *Vanguard Pai Lung, LLC v. Moody*, 387 N.C. 376, 379-80, 912 S.E.2d 788, 791-92 (2025) ("Thus, to survive a motion for JNOV, the nonmovant need only point to 'more than a scintilla of evidence' that supports its claim . . . The nonmovant meets this low bar by demonstrating that the evidence would permit the jury to resolve the evidentiary conflicts in its favor based on more than raw 'suspicion, conjecture, guess, surmise, or speculation.'" (quoting *Morris*, 368 N.C. at 861, 788 S.E.2d at 761).

Finally, in *Schroeder*, the case relied on by the majority's assertion that this issue is "settled," the Court follows the *Vanguard/Morris* standard, which the Court had previously and specifically rejected in *Scarborough* and the long line of cases which followed. *See Schroeder,* 388 N.C. at 214, 919 S.E.2d at 137.

The trial court properly analyzed the issue in accordance with the standard set forth by controlling precedents in *Davis* and *Scarborough,* and the rationale set forth by the Supreme Court of the United States in *Anderson.* In light of the confusion in our case law on this issue, the earlier and prevailing standard the Court adopted from *Anderson* is "pertinent for guidance and enlightenment as we develop the philosophy of [our Rules of Civil Procedure.]" *Johnson v. Johnson*, 14 N.C. App. 40, 42, 187 S.E.2d 420, 421 (1972).

Following *Anderson*, *Davis*, and *Scarborough*, the proper standard of review at the close of all the evidence is whether Caveators produced sufficient evidence by which reasonable jurors could find, by a preponderance of the evidence, the execution

13

of the 2019 will was the result of undue influence or duress placed upon Pam by Propounder. The trial court, after properly denying the Propounder's motion at the close of Caveator's evidence on the "scintilla" standard, heard Propounder's evidence and, at the renewed motion *at the close of all evidence*, answered "no." The trial court's order is presumed to be correct and the burden to show error and prejudice is on the Caveators as appellants.

## E. Review of the Trial Court's Ruling

I agree with the trial court and vote to affirm the directed verdict entered at the close of all the evidence. The evidence tends to show in October 2019, Pam was in a physical and mental state, which rendered her more susceptible to undue influence or duress by others due to her progressed illness. However, taken in the light most favorable to Caveators, the trial court held the evidence fails to show Propounder's purported expressed disagreement with Pam's prior estate plan in the weeks before her death rose to the level of showing undue influence or duress.

"[U]ndue influence is more than mere persuasion, because a person may be influenced to do an act which is nevertheless his voluntary action." *In re Buck,* 130 N.C. App. 408, 413, 503 S.E.2d 126, 130 (1998), *aff'd*, 350 N.C. 621, 516 S.E.2d 858 (1999). The only evidence tending to show Propounder was attempting to influence Pam to change her will was through Abigail's and Jaylie's testimonies, Propounder would purportedly complain on a weekly basis about the lack of provision made for him in Pam's 2012 will. Taken as true, this is not sufficient to "support an inference

14

that the will was the result of an overpowering influence" exerted by Propounder, which caused Pam to "execute[] a will that she otherwise would not have executed." *In re will of Coley,* 53 N.C. App. 318, 324, 280 S.E.2d 770, 774 (1981). The evidence, taken as true, was certainly insufficient to submit the issue of duress to the jury. *Id.*

Pam worked independently with her long-time attorney to devise the 2019 will. Her daughter, Carrington, not Propounder, called Pam's attorney's office to procure the will's preparation and execution while Pam was hospitalized. Propounder was not present when the will was signed. Pam was never isolated from others.

The 2019 will was consistent with Pam's long-term estate planning goals to provide for her daughter through a trust. The 2019 will was unlikely to ever actually benefit Propounder when executed, and Carrington was seven years older. Pam and Propounder had been married an additional seven years since the 2012 will was executed. A spouse is a natural object of a testator's bounty. *See In re Will of Broach,* 172 N.C. 520, 524, 90 S.E. 681, 683 (1916) ("[T]he fact that a wife has influence with her husband, and even if there is evidence that she is the dominant partner, this does not of itself prove that she exerted that influence to dictate the terms of the will[.]").

Even if we properly applied the "more than a scintilla" rule to the facts of this case, as the majority's opinion does, the analysis would produce the same result. Under the scintilla rule, the non-movant's evidence still must "do more than raise a suspicion, conjecture, guess, surmise, or speculation as to the pertinent facts in order to justify its submission to the jury." *Jenrette Transp. Co. v. Atl. Fire Ins. Co.*, 236

15

N.C. 534, 539, 73 S.E.2d 481, 485 (1952) (citation omitted).

Here, this uncontroverted self-proving 2019 will was valid, and the jury's verdict found Pam possessed testamentary capacity and was competent when she executed the 2019 will. The duly probated and long-established will, under which Abigail serves as fiduciary executor and trustee, is what she now seeks to impeach. The trial court's order is properly affirmed.

## VI. Conclusion

Where Caveators failed to produce sufficient evidence "upon which a jury can properly proceed to find a verdict for [Caveators]," the trial court, at the close of all the evidence, properly granted directed verdict in favor of Propounder on the issues of undue influence and duress and submitted Pam's testamentary capacity to execute the valid self-proving 2019 will to the jury. *Anderson,* 477 U.S. at 251, 91 L. Ed. 2d at 213. *See also Davis*, 330 N.C. at 322-23, 411 S.E.2d at 138; *Scarborough*, 363 N.C. at 715, 693 S.E.2d at 644. The order appealed from is properly affirmed. I respectfully dissent.